**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| THE TRAVELERS INDEMNITY COMPANY,<br><br>    Plaintiff,<br><br>  v.<br><br>INTELLECTUAL VENTURES I LLC, INTELLECTUAL VENTURES II LLC, CALLAHAN CELLULAR LLC, ZARBAÑA DIGITAL FUND LLC, OL SECURITY LLC, CUFER ASSET LTD. LLC, GULA CONSULTING LLC, and TAMIRAS PER PTE. LTD., LLC,<br><br>    Defendants. | Civil Action No. _____<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR DECLARATORY JUDGMENT OF NON-INFRINGEMENT**

Plaintiff The Travelers Indemnity Company ("Travelers") brings this Complaint for Declaratory Judgment against Defendants Intellectual Ventures I LLC ("IV I"), Intellectual Ventures II LLC ("IV II"), Callahan Cellular LLC, Zarbaña Digital Fund LLC, OL Security LLC, Cufer Asset Ltd. LLC, Gula Consulting LLC, and Tamiras Per Pte. Ltd., LLC (collectively, "IV" or "Defendants"). Travelers alleges as follows:

**NATURE OF THE ACTION**

1. This is an action for declaratory judgment of non-infringement arising under the patent laws of the United States, Title 35 of the United States Code. Travelers requests this relief because IV has accused Travelers of infringing certain patents allegedly owned by IV or its subsidiaries, including U.S. Patent Nos. 8,332,844 (the "844 Patent"), 7,949,785 (the "785 Patent"), 8,407,722 (the "722 Patent"), 7,257,582 (the "582 Patent"), 7,712,080 (the "080 Patent"),

1

7,669,081 (the "081 Patent"), 8,352,584 (the "584 Patent"), 8,447,762 (the "762 Patent"), RE48,894 (the "894 Patent"), 7,930,287 (the "287 Patent"), 9,686,183 (the "183 Patent"), 8,266,124 (the "124 Patent"), 7,840,589 (the "589 Patent"), and 9,047,349 (the "349 Patent") (collectively, the "DJ Patents;" attached as Exs. 1-14 hereto), by the alleged use of certain software, including third-party software known as Docker, Kubernetes, Kafka, Spark, Airflow, MongoDB, and Elasticsearch. IV has threatened to sue Travelers under the DJ Patents if Travelers does not pay IV a license fee.

2.      Travelers, however, has not and does not infringe any claim of the DJ Patents, and Travelers is not required to pay IV a license fee. IV's assertion of the DJ patents against Travelers is impacting Travelers's business and relationships with its vendors and customers, creating a justiciable controversy between Travelers and IV. A judicial declaration is necessary and appropriate so that Travelers may ascertain its rights with respect to the DJ Patents.

## THE PARTIES

3.      Plaintiff The Travelers Indemnity Company is a corporation organized under the laws of the State of Connecticut, with a principal place of business located at One Tower Square, Hartford, Connecticut 06183. Travelers is an operating subsidiary of The Travelers Companies, Inc., which is the parent holding company of Travelers. Travelers is a leading provider of personal, business, and specialty insurance.

4.      On information and belief, Defendant Intellectual Ventures I LLC is a Delaware limited liability company, with its principal place of business located at 3150 139th Avenue SE, Bellevue, Washington 98005.

5.      On information and belief, Defendant Intellectual Ventures II LLC is a Delaware limited liability company, with its principal place of business located at 3150 139th Avenue SE, Bellevue, Washington 98005.

6.      On information and belief, Defendant Callahan Cellular LLC. is a Delaware limited liability company, with its principal place of business located at 2711 Centerville Road, Suite 400 Wilmington, Delaware 19808.

7.      On information and belief, Defendant Zarbaña Digital Fund LLC is a Delaware limited liability company with its principal place of business located at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

8.      On information and belief, Defendant OL Security LLC is a Delaware limited liability company, with its principal place of business located at 160 Greentree Drive Suite 101 Dover, Delaware 19904.

9.      On information and belief, Defendant Cufer Asset Ltd. LLC is a Delaware limited liability company, with its principal place of business located at 1209 Orange Street, Wilmington, Delaware 19801.

10.     On information and belief, Defendant Gula Consulting LLC is a Delaware limited liability company, with its principal place of business located at 160 Greentree Drive, Suite 101, Dover, Delaware 19904.

11.     On information and belief, Defendant Tamiras Per Pte. Ltd., LLC is a Delaware limited liability company, with its principal place of business located at 160 Greentree Drive, Suite 101, Dover, Delaware 19904.

3

## JURISDICTION AND VENUE

12.     This action arises under the Declaratory Judgment Act, 28 U.S.C. § 2201, and under the patent laws of the United States, 35 U.S.C. § 1, *et seq.*

13.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, 1338, 2201, and 2202. An actual, substantial, immediate, and continuing controversy exists between IV and Travelers that requires a declaration of rights by this Court regarding the DJ Patents. Among other things and as detailed herein, beginning in December 2023, escalating thereafter, and continuing through at least April 7, 2026, IV has repeatedly targeted Travelers as part of a patent licensing and enforcement campaign, asserting that Travelers was required to obtain a patent license from IV to avoid being sued for infringement. For example, IV sent Travelers a "formal notice letter" (attached as Ex. 15 hereto) in June 2024 accusing Travelers of infringing the DJ Patents, thereafter IV threatened Travelers with "escalation" (i.e., to file a patent infringement lawsuit against Travelers) if Travelers does not pay IV for a license to the DJ Patents, and IV expressly said in March 2025 that "[a]dditional litigations are planned against other institutions unwilling to negotiate." IV's Email Correspondence to Travelers, dated December 14, 2023, through March 17, 2025 (attached as Ex. 16 hereto). In August 2025, IV followed up with a second or supplemental notice letter (attached as Ex. 17 hereto), continuing to threaten suits for additional patents IV newly identified in that letter. As an additional example, IV sent Travelers a third notice letter on April 7, 2026 from the Kasowitz law firm (attached as Ex. 18 hereto), adding additional patents, and noting "Travelers has already received communications pertaining to several (but not all) of these listed patents/technologies" and that "IV does not authorize Travelers or Travelers's customers or partners to practice any of the above patents and/or other IV patent rights without a license." Travelers, however, has not and does not infringe any of the DJ Patents,

and Travelers is not required to pay IV for a license to the DJ Patents. IV's actions have created a real, live, immediate, and justiciable dispute between Travelers and IV as to whether Travelers infringes the DJ Patents. Travelers also understands, and alleges upon information and belief, that IV has filed numerous lawsuits against other companies asserting the DJ Patents based on those companies' use of the same software IV accuses Travelers of infringing. Travelers further understands, and alleges upon information and belief, that IV is currently and actively seeking license payments from or otherwise asserting the DJ Patents against, additional parties that IV has not yet sued, but accuses of infringing the DJ patents through use of the same software.

14. This Court has personal jurisdiction over each Defendant under the laws of this State and consistent with the underlying due process principles of the United States Constitution, including because each Defendant is incorporated in, does business in, or has otherwise purposefully availed itself of the laws of the State of Delaware.

15. This Court has personal jurisdiction over IV I under the laws of this State and consistent with the underlying due process principles of the United States Constitution. IV I also is subject to general personal jurisdiction in Delaware because it was formed under the laws of the State of Delaware.

16. This Court has personal jurisdiction over IV II under the laws of this State and consistent with the underlying due process principles of the United States Constitution. IV II also is subject to general personal jurisdiction in Delaware because it was formed under the laws of the State of Delaware.

17. This Court has personal jurisdiction over Callahan Cellular LLC under the laws of this State and consistent with the underlying due process principles of the United States

Constitution. Callahan Cellular LLC also is subject to general personal jurisdiction in Delaware because it was formed under the laws of the State of Delaware.

18.    This Court has personal jurisdiction over Zarbaña Digital Fund LLC under the laws of this State and consistent with the underlying due process principles of the United States Constitution. Zarbaña Digital Fund LLC also is subject to general personal jurisdiction in Delaware because it was formed under the laws of the State of Delaware.

19.    This Court has personal jurisdiction over OL Security LLC under the laws of this State and consistent with the underlying due process principles of the United States Constitution. OL Security LLC also is subject to general personal jurisdiction in Delaware because it was formed under the laws of the State of Delaware.

20.    This Court has personal jurisdiction over Cufer Asset Ltd. LLC under the laws of this State and consistent with the underlying due process principles of the United States Constitution. Cufer Asset Ltd. LLC also is subject to general personal jurisdiction in Delaware because it was formed under the laws of the State of Delaware.

21.    This Court has personal jurisdiction over Gula Consulting LLC under the laws of this State and consistent with the underlying due process principles of the United States Constitution. Gula Consulting LLC also is subject to general personal jurisdiction in Delaware because it was formed under the laws of the State of Delaware.

22.    This Court has personal jurisdiction over Tamiras Per Pte. Ltd., LLC under the laws of this State and consistent with the underlying due process principles of the United States Constitution. Tamiras Per Pte. Ltd., LLC also is subject to general personal jurisdiction in Delaware because it was formed under the laws of the State of Delaware.

23.    The IV entities also have purposefully availed themselves of this forum by bringing prior actions seeking to enforce their patent rights in Delaware. *See e.g., Intellectual Ventures I LLC v. Ubiquiti Inc.*, No. 23-cv-865, D.I. 1 (D. Del. Aug. 8, 2023). On information and belief, the IV entities also have entered into licensing agreements for the use of their patents in Delaware, and they have each sent other cease and desist letters into the forum to other entities regarding their patents.

24.    Venue is proper in this judicial district under at least 28 U.S.C. § 1391(b), (c) because each Defendant is a resident of, incorporated in, or subject to personal jurisdiction in this District.

### THE DJ PATENTS

25.    IV I alleges it is the owner or assignee of the 785, 722, 582, 080, and 894 Patents. *See, e.g.,* Ex. 18 (IV April 7, 2026, Third Notice Letter to Travelers) (as to 785, 722, 582, and 894 Patents) and *IV v. Southwest Airlines Co.*, No. 24-cv-277, D.I. 1 ¶¶ 4, 29, 31, 37; D.I. 97 ¶¶ 4, 35 (N.D. Tex. Nov. 2, 2024); *IV v. American Airlines, Inc.*, No. 24-cv-980, D.I. 1 ¶¶ 4, 27, 29, 35; D.I. 84 ¶¶ 4, 37 (E.D. Tex. Nov. 2, 2024) (as to 080 Patent). As noted previously, the 785, 722, 582, and 080 Patents are attached as Exs. 2-5 and the 894 Patent is attached as Ex. 9.

26.    IV II alleges it is the owner or assignee of 844 and 584 Patents. *See, e.g.,* Ex. 18 (IV April 7, 2026, Third Notice Letter to Travelers). As noted previously, the 844 and 584 Patents are attached as Exs. 1 and 7 respectively.

27.    IV alleges that OL Security LLC is a wholly owned subsidiary of the IV entities and that OL Security LLC is the assignee of the 081 and 287 Patents. *See, e.g.*, Ex. 18 (IV April 7, 2026, Third Notice Letter to Travelers). As noted previously, the 081 and 287 Patents are attached as Exs. 6 and 10 respectively.

28.     IV alleges that Cufer Asset Ltd. LLC is a wholly owned subsidiary of the IV entities and that Cufer Asset Ltd. LLC is the assignee of the 762 Patent. *See, e.g.*, Ex. 18 (IV April 7, 2026, Third Notice Letter to Travelers). As noted previously, the 762 Patent is attached as Ex. 8.

29.     IV alleges that Zarbaña Digital Fund LLC is a wholly owned subsidiary of the IV entities and that Zarbaña Digital Fund LLC is the assignee of the 183 Patent. *See, e.g.*, Ex. 18 (IV April 7, 2026, Third Notice Letter to Travelers). As noted previously, the 183 Patent is attached as Ex. 11.

30.     IV alleges that Callahan Cellular, LLC is a wholly owned subsidiary of the IV entities and that Callahan Cellular, LLC is the assignee of the 124 Patent. *See, e.g.*, Ex. 18 (IV April 7, 2026, Third Notice Letter to Travelers). As noted previously, the 124 Patent is attached as Ex. 12.

31.     IV alleges that Gula Consulting LLC is a wholly owned subsidiary of the IV entities and that Gula Consulting LLC is the assignee of the 589 Patent. *See, e.g.*, Ex. 18 (IV April 7, 2026, Third Notice Letter to Travelers). As noted previously, the 589 Patent is attached as Ex. 13.

32.     IV alleges that Tamiras Per Pte. Ltd., LLC is a wholly owned subsidiary of the IV entities and that Tamiras Per Pte. Ltd., LLC is the assignee of the 349 Patent. *See, e.g.*, Ex. 18 (IV April 7, 2026, Third Notice Letter to Travelers). As noted previously, the 349 Patent is attached as Ex. 14.

## FACTUAL BACKGROUND

33.     IV is in the business of monetizing patents, including through licensing campaigns and by filing patent litigations. IV's typical approach includes engaging in licensing campaigns targeting a given set of companies, repeatedly contacting target companies, attempting to negotiate licenses with companies that respond, and filing – and aggressively pursuing – patent litigation against companies that decline to engage or pay IV to license IV's patents. This strategy is designed

to apply sustained pressure, to use litigation as leverage, and to extract substantial portfolio-level license fees irrespective of whether the asserted patents are actually infringed, valid, or enforceable.

### A.    IV's Assertion of the DJ Patents Against Travelers

34.    On December 14, 2023, IV contacted Travelers by email "to initiate a dialogue concerning intellectual property and licensing matters with The Travelers Companies, Inc." and in particular to explore "IV's expansive patent portfolio and its relevance to The Travelers Companies, Inc.'s operations." *See* Ex. 16 at 9 (IV's Email Correspondence with Travelers, dated December 14, 2023 through March 17, 2025). IV said it is "a pioneer in patent aggregation, licensing, and sales" who has "over the past two decades [] invested billions in acquiring, maintaining, and licensing patents" and has a portfolio of "over 7,000 active patents." *Id.* IV asserted that "[n]otably, these patents align closely with the technologies integral to The Travelers Companies, Inc.'s daily operations, including cloud computing, networking, security, storage, digital payments, and utilization of open-source software, among others." *Id.* IV said it was "eagerly await[ing Travelers's] response and the proposal of suitable dates and times for our inaugural discussion." *Id.*

35.    On June 25, 2024, IV emailed Travelers again, noting that "[s]ince [IV's] initial email on October 2, 2023, we have not received any response or engagement from Allstate [sic, typo; should have been December, 14 2023 email to Travelers]." *See* Ex. 16 at 7 (IV's Email Correspondence with Travelers, dated December 14, 2023 through March 17, 2025). IV wrote that "given the lack of constructive engagement from your end, we are left with no alternative but to formally put The Travelers Companies, Inc. on notice. Attached to this email, you will find the formal notice letter outlining our concerns in detail." *Id.* IV said it "hope[d] that this notice will prompt a more proactive response from Travelers." *Id.*

36.     IV's first "formal notice letter" to Travelers (Ex. 15), which was dated June 24, 2024, said "[IV] would like to call [Travelers] attention to four patents in particular, which cover technologies used in at least the example products, platforms, features, and/or services listed in the table below that Travelers makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import." Ex. 15.

| US Patent No. | Title | Assignee | Example Claim | Example Product/Feature |
|---|---|---|---|---|
| 7,257,582 | LOAD BALANCING WITH SHARED DATA | CUFER ASSET LTD. L.L.C. a wholly owned subsidiary of IIF1 | 1 | Open Source Software: Travelers's use of Apache Spark https://careers.travelers.com/job/20006024/sr-director-data-architecture-hartford-ct/ |
| 7,949,785 | SECURE VIRTUAL COMMUNITY NETWORK SYSTEM | INTELLECTUAL VENTURES I LLC | 30 | Open Source Software: Travelers 's use of Kubernetes https://careers.travelers.com/job/20321013/data-engineer-i-underwriting-automation-and-artificial-intelligence-hartford-ct/ |
| 8,332,844 | ROOT IMAGE CACHING AND INDEXING FOR BLOCK-LEVEL DISTRIBUTED APPLICATION MANAGEMENT | INTELLECTUAL VENTURES II LLC | 7 | Open Source Software: Travelers's use of Docker https://careers.travelers.com/job/20321013/data-engineer-i-underwriting-automation-and-artificial-intelligence-hartford-ct/ |
| 8,407,722 | ASYNCHRONOUS MESSAGING USING A NODE SPECIALIZATION ARCHITECTURE IN THE DYNAMIC ROUTING NETWORK | INTELLECTUAL VENTURES I LLC | 14 | Open Source Software: Travelers 's use of Kafka https://careers.travelers.com/job/20421843/software-engineer-i-servicenow-fso-javascript-saint-paul-mn/ |

IV noted "these patents are offered as an initial list of example patents and example infringing products and that IV's investigation of Travelers products and services is ongoing" and enclosed copies of the 844, 785, 722, and 582 Patents (as noted above, Exs. 1-4). IV's notice letter concluded by saying "IV does not authorize Travelers or Travelers's customers or partners to practice any of the above patents and/or other IV patent rights without a license." Ex. 15.

37.     On September 25, 2024, IV sent an email to Travelers "to follow up on the formal notice letter sent to The Travelers Companies, Inc. on June 25, 2024, regarding the need for a license to the Intellectual Ventures patent portfolio." *See* Ex. 16 at 6. IV wrote "Travelers is required to obtain a license to [IV's] patent portfolio for [Travelers's] operations within the financial services sector. Based on Travelers's last reported U.S. revenue of $34.82 billion, [IV

10

said] the proposed one-time license fee is $4.5 million" and referred to "a pricing sheet [attached] for your reference." *Id.* IV's email concluded that, "[i]n an effort to avoid escalation, [IV] would like to offer whatever is needed to move forward with licensing discussions" and suggested several options (e.g., "an introductory meeting, send claim charts to demonstrate how the patents map to your operations, or provide a draft license agreement"). *Id.*

38.    The "pricing sheet" attached to IV's September 25, 2024 email (attached as <u>Ex. 19</u> hereto) was entitled "Insurance Licensing" and said IV "offers to license its portfolio using a systematic approach across the financial services and insurance sectors, encompassing the entire scope of those businesses." *See* Ex. 19. IV's pricing sheet set forth a tiered "Insurance License Fee" ranging from $1.0 million to $5.25 million based on the target company's "U.S. Revenue." *Id.* IV's pricing sheet concluded by stating that IV "seeks to enforce its patent rights, with patent litigations pending against JPMC, Liberty Mutual, and Comerica, with further actions planned." *Id.*

39.    On January 10, 2025, IV sent Travelers another email to follow up again on "the formal notice letter sent to The Travelers Companies, Inc. on June 25, 2024, regarding the need for a license to the Intellectual Ventures patent portfolio." *See* Ex. 16 at 5 (. IV wrote "[d]espite our multiple attempts to engage with Travelers before and after the notice, we have yet to receive any response, which remains a significant concern." *Id.* IV reiterated its assertion that "Travelers is required to obtain a license to [IV's] patent portfolio for your financial services operations," $4.5 million demand, and request "to move discussions forward and avoid unnecessary escalation" (e.g., set meeting, share infringement claim charts, provide draft license agreement). *Id.* IV "request[ed] a response by January 22, 2025, indicating how [Travelers] would like to proceed" and wrote that "[i]f no engagement is received by this date, we may need to consider further

11

escalation, which we hope to avoid." IV closed by saying IV "remain[s] committed to resolving this matter amicably." *Id.*

40.     On February 11, 2025, IV sent Travelers another email, referred back to IV's prior communications, formal notice letter, and $4.5 million demand, and noted that to date IV had "successfully licensed 35 financial services companies, demonstrating [IV's] ability to work constructively with reasonable companies without resorting to litigation." *Id.* at 4-5. Additionally, IV wrote it "recently resolved three litigations with JPMorgan Chase, Liberty Mutual, and Comerica, further underscoring the strength and value of the IV patent portfolio" and attached copies of the dismissal orders filed in the Liberty Mutual and Comerica cases on January 17, 2025. IV reiterated its request to engage in licensing discussions with Travelers and asked for a response by March 7, 2025, "so that [IV does]n't misinterpret the continued lack of engagement as unwillingness to resolve this matter amicably." *Id.*

41.     On March 17, 2025, IV emailed Travelers again to follow up on IV's June 25, 2024 formal notice letter to Travelers regarding infringement of IV's patents. *Id.* at 4. IV wrote "[s]ince [IV's] last correspondence, there have been notable developments:" (i) "two of the [IV] patents asserted" had survived ex parte reexamination at the U.S. Patent and Trademark Office ("USPTO"), which IV said "reaffirm[ed] the validity of their claims and further strengthen[ed] their enforceability," (ii) IV "filed two new patent litigations against Nationwide Mutual Insurance and The Bank of New York Mellon, after those institutions declined to engage in licensing discussions," (iii) IV said "[a]dditional litigations are planned against other institutions unwilling to negotiate," and (iii) IV noted "35 financial institutions have already entered into licenses with IV, demonstrating broad industry recognition of the strength and relevance of the portfolio." *Id.*

IV's email concluded that "[f]or the time being, we are open to constructive discussions with The Travelers Companies to resolve this matter amicably and without litigation." *Id.*

42.     On August 29, 2025, IV followed up with a second or supplemental notice letter (attached as Ex. 17 hereto), continuing to threaten suit and identifying additional patents in that letter. Again IV's August 2025 notice letters stated that listed products/features were only "example infringing products" and that IV's "investigation of Travelers products and services is ongoing." IV expressly asserted that it "does not authorize Travelers or Travelers's customers or partners to practice any of the above patents and/or other IV patent rights without a license" and stated that IV was willing to offer a patent license either to the referenced patents or to a broader subset of IV's portfolio.

43.     On April 7, 2026, IV followed up with a third notice letter from the Kasowitz law firm (attached as Ex. 18 hereto), adding additional patents, and noting "Travelers has already received communications pertaining to several (but not all) of these listed patents/technologies" and that "IV does not authorize The Travelers or Travelers's customers or partners to practice any of the [below] patents and/or other IV patent rights without a license." Ex. 18 at 3.

| US Patent No. | Title | Assignee | Example Claim | Example Product/Feature |
|---|---|---|---|---|
| 7,257,582 | LOAD BALANCING WITH SHARED DATA | INTELLECTUAL VENTURES I LLC | 1 | Open Source Software: Travelers' use of Spark and/or PySpark See June 2024 Notice Letter |
| 7,669,081 | SYSTEMS AND METHODS FOR SCHEDULING, PROCESSING, AND MONITORING TASKS | OL SECURITY LIMITED LIABILITY COMPANY a wholly owned subsidiary of IIF2 | 1 | Open Source Software: Travelers' use of Spark and/or PySpark See August 2025 Notice Letter |
| 7,840,589 | SYSTEMS AND METHODS FOR USING LEXICALLY-RELATED QUERY ELEMENTS WITHIN A DYNAMIC OBJECT FOR SEMANTIC SEARCH REFINEMENT AND NAVIGATION | GULA CONSULTING LIMITED LIABILITY COMPANY a wholly owned subsidiary of IIF2 | 22 | UI: Travelers Website Search See Enclosures |
| 7,930,287 | SYSTEMS AND METHODS FOR COMPOUND SEARCHING | OL SECURITY LIMITED LIABILITY COMPANY a wholly owned subsidiary of IIF2 | 28 | Open Source Software: Travelers' use of Elasticsearch See August 2025 Notice Letter |
| 7,949,785 | SECURE VIRTUAL COMMUNITY NETWORK SYSTEM | INTELLECTUAL VENTURES I LLC | 30 | Open Source Software: Travelers' use of Kubernetes See June 2024 Notice Letter |
| 8,266,124 | INTEGRATED ASSET MANAGEMENT | CALLAHAN CELLULAR L.L.C. a wholly owned subsidiary of IIF2 | 1 | Open Source Software: Travelers' use of Kubernetes See Enclosures |
| 8,332,844 | ROOT IMAGE CACHING AND INDEXING FOR BLOCK-LEVEL DISTRIBUTED APPLICATION MANAGEMENT | INTELLECTUAL VENTURES II LLC | 7 | Open Source Software: Travelers' use of Docker See June 2024 Notice Letter |
| 8,352,584 | SYSTEM FOR HOSTING CUSTOMIZED COMPUTING CLUSTERS | INTELLECTUAL VENTURES II LLC | 1 | Open Source Software: Travelers' use of Kubernetes See August 2025 Notice Letter |
| 8,407,722 | ASYNCHRONOUS MESSAGING USING A NODE SPECIALIZATION | INTELLECTUAL VENTURES I LLC | 14 | Open Source Software: Travelers' use of Kafka |

14

| US Patent No. | Title | Assignee | Example Claim | Example Product/Feature |
|---|---|---|---|---|
| | ARCHITECTURE IN THE DYNAMIC ROUTING NETWORK | | | See June 2024 Notice Letter |
| 8,447,762 | STORING LOSSY HASHES OF FILE NAMES AND PARENT HANDLES RATHER THAN FULL NAMES USING A COMPACT TABLE FOR NETWORK-ATTACHED-STORAGE (NAS) | CUFER ASSET LTD. L.L.C.<br><br>a wholly owned subsidiary of IIF1 | 7 | Open Source Software: Travels' use of MongoDB See August 2025 Notice Letter |
| 9,047,349 | METHODS FOR EFFECTIVE PROCESSING OF TIME SERIES | TAMIRAS PER PTE. LTD., LLC<br><br>a wholly owned subsidiary of IIF2 | 1 | Open Source Software: Travelers' use of Elasticsearch See Enclosures |
| 9,686,183 | DIGITAL OBJECT ROUTING BASED ON A SERVICE REQUEST | ZARBAÑA DIGITAL FUND LLC<br><br>a wholly owned subsidiary of IIF1 | 1 | Open Source Software: Travelers' use of Airflow See Enclosures |
| RE48,894 | DISAGGREGATED RESOURCES AND ACCESS METHODS | INTELLECTUAL VENTURES I LLC | 15 | Open Source Software: Travelers' use of Kafka See August 2025 Notice Letter |

**B.      IV's Infringement Allegations Against the Products Accused at Travelers**

44.      IV has filed patent infringement complaints against at least 10 companies to date asserting infringement of the DJ Patents by the same third-party software products IV has accused at Travelers. IV's infringement allegations, as discussed below and shown in claim charts attached to IV's complaints, focus on off-the-shelf/built-in functionality in the underlying accused software products, not on any feature, customization, or configuration unique to Travelers or any other accused defendant.

45.      IV accuses the following third-party software at Travelers of infringement:

a.   IV asserts the 844 Patent against Docker

b.   IV asserts the 785 Patent against Kubernetes

c.   IV asserts the 722 Patent against Kafka

d.   IV asserts the 582 Patent against Spark

e.   IV asserts the 080 Patent against Airflow and/or Spark

f.   IV asserts the 081 Patent against Spark

g.   IV asserts the 762 Patent against MongoDB

h.   IV asserts the 894 Patent against Kafka

i.   IV asserts the 287 Patent against Elasticsearch

j.   IV asserts the 124 Patent against Kubernetes

k.   IV asserts the 183 Patent against Airflow

l.   IV asserts the 589 Patent against website search functionality on Travelers.com

m.  IV asserts the 349 Patent against Elasticsearch

*See* Exs. 15 and 17-18 (IV "formal notice letters" to Travelers).

46.   IV does not allege Travelers makes the underlying accused Docker, Kubernetes, Kafka, Spark, Airflow, MongoDB, or Elasticsearch software. Rather, the software and products that IV accused of infringement are allegedly provided by third parties or are open source, and IV alleges Travelers uses the accused software and products.

47.   IV has filed several waves of litigation asserting the DJ Patents and other patents accusing the exact same third-party software IV accuses at Travelers, as summarized below:

| # | Case | Accused Products |
|---|---|---|
| 1. | *IV v. JP Morgan Chase & Co.*, No. 23-cv-523 (E.D. Tex. Nov. 15, 2023) | • 844 Patent vs. Docker<br>• 785 Patent vs. Kubernetes<br>• 722 Patent vs. Kafka<br>• 080 Patent vs. Spark |
| 2. | *IV v. Comerica Inc.*, No. 23-cv-524 (E.D. Tex. Nov. 15, 2023) | • 844 Patent vs. Docker<br>• 785 Patent vs. Kubernetes<br>• 722 Patent vs. Kafka<br>• 080 Patent vs. Spark |
| 3. | *IV v. Liberty Mutual Holding Co. Inc.*, No. 23-cv-525 (E.D. Tex. Nov. 15, 2023) | • 844 Patent vs. Docker<br>• 785 Patent vs. Kubernetes<br>• 722 Patent vs. Kafka<br>• 080 Patent vs. Spark |

| # | Case | Accused Products |
|---|------|------------------|
| 4. | *IV v. American Airlines, Inc.*, No. 24-cv-980 (E.D. Tex. Nov. 2, 2024) | • 844 Patent vs. Docker<br>• 785 Patent vs. Kubernetes<br>• 722 Patent vs. Kafka<br>• 582 Patent vs. Spark<br>• 080 Patent vs. Spark |
| 5. | *IV v. Southwest Airlines Co.*, No. 24-cv-277 (W.D. Tex. Nov. 2, 2024) | • 844 Patent vs. Docker<br>• 785 Patent vs. Kubernetes<br>• 722 Patent vs. Kafka<br>• 582 Patent vs. Spark<br>• 080 Patent vs. Spark |
| 6. | *IV v. The Bank of New York Mellon Corp.*, No. 25-cv-631 (N.D. Tex. Mar. 15, 2025) | • 844 Patent vs. Docker<br>• 080 Patent vs. Spark |
| 7. | *IV v. Nationwide Mutual Insurance Co.*, No. 25-cv-632 (N.D. Tex. Mar. 15, 2025) | • 844 Patent vs. Docker<br>• 080 Patent vs. Spark |
| 8. | *IV v. The Home Depot, Inc. et al*, No. 25-cv-1147 (W.D. Tex. July 23, 2025) | • 844 Patent vs. Docker<br>• 582 Patent vs. Spark<br>• 080 Patent vs. Spark |
| 9. | *IV v. Deere & Co.*, No. 26-cv-425 (W.D. Tex. Feb. 24, 2026) | • 844 Patent vs. Docker<br>• 584 Patent vs. Kubernetes<br>• 080 Patent vs. Spark |
| 10. | *IV v. Government Employees Insurance Co.*, No. 26-cv-978 (N.D. Tex. Mar. 26, 2026) | • 844 Patent vs. Docker<br>• 785 Patent vs. Kubernetes<br>• 080 Patent vs. Spark |

48.     Prior to filing suit – including in IV's March 2025 suits vs. Nationwide and Bank of New York Mellon, July 2025 suit vs. Home Depot, and February 2026 suit vs. Deere, IV sent "formal notice letters" from the Kasowitz law firm that were essentially identical to IV's April 7, 2026, formal notice letter to Travelers, including substantially the same table listing out asserted patents and accused products against those defendants. *Compare, e.g.,* Ex. 18 (2026 IV notice from Kasowitz to Travelers), *with* Exs. 20-21 attached hereto (2025 IV notice from Kasowitz to Nationwide, Bank of New York Mellon, and Home Depot sent in advance of IV's filing of suit against these companies; 2026 IV notice from Kasowitz to Deere & Company sent in advance of IV's filing of suit against this company).

17

49.     IV's infringement allegations against the third-party Docker, Kubernetes, Kafka, and Spark software that IV accuses at Travelers are illustrated by claim charts IV has filed in IV's recent litigation campaigns accusing the third-party software of infringement. *See, e.g.*:

a.  *IV v. Nationwide* (attached as Ex. 22 hereto): IV's infringement claim chart for the 844 Patent vs. Docker

b.  *IV v. American Airlines* (attached as Ex. 23 hereto): IV's infringement claim chart for the 785 Patent vs. Kubernetes

c.  *IV v. American Airlines* (attached as Ex. 24 hereto): IV's infringement claim chart for the 722 Patent vs. Kafka

d.  *IV v. American Airlines* (attached as Ex. 25 hereto): IV's infringement claim chart for the 582 Patent vs. Spark

e.  *IV v. American Airlines* (attached as Ex. 26 hereto): IV's infringement claim chart for the 080 Patent vs. Spark.

f.  *IV v. Bank of New York Mellon* (attached as Ex. 27 hereto): IV's infringement claim chart for the 584 Patent vs. Kubernetes

50.     As IV's claim charts show, IV's allegations focus on the underlying third-party Docker, Kubernetes, Kafka, and Spark software itself to allege infringement. *See* Exs. 22-27.

**COUNT I**
**DECLARATION OF NON-INFRINGEMENT OF THE 844 PATENT**

51.     Travelers incorporates by reference paragraphs 1-50 as if fully set forth herein.

52.     The 844 Patent is titled "Root Image Caching and Indexing for Block-Level Distributed Application Management." The 844 Patent's Abstract states:

Described herein is technology for, among other things root image caching and indexing for block-level distributed application management. The technology involves storing blocks of a root image on a first storage unit and storing blocks of

leaf images on respective second storage units. The leaf images include additional data blocks not previously contained in the root image and changes made by respective compute nodes to the blocks of the root image. The technology includes caching blocks of the root image that have been accessed by at least one compute node. The technology also includes receiving indexing results pertaining to the root image from one compute node and providing the results for other compute nodes.

53.     IV has asserted that third-party software called Docker that IV alleges Travelers is using (the "844 Accused System") infringes the 844 Patent. In particular, IV asserts that Travelers "makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import" the 844 Accused System in a manner that infringes Claim 7 of the 844 Patent. *See e.g.,* Exs. 15, 18.

54.     Contrary to IV's assertions, Travelers has not infringed and does not infringe, under any theory of infringement (including directly (whether individually or jointly), indirectly (whether contributorily or by inducement), and/or under the doctrine of equivalents), any claim of the 844 Patent, including through any making, use, offering to sell, selling, and/or encouraging the making, using, selling, offering to sell, and/or importation of the 844 Accused System or Docker, at least because the 844 Accused System and Docker do not employ, incorporate, use, or otherwise include all of the limitations of the 844 Patent's claims. IV's infringement contentions for the 844 Patent (Ex. 21) also fail to show any infringement by the 844 Accused System or Docker.

55.     Although there are additional reasons why Travelers, the 844 Accused System, and Docker do not infringe the 844 Patent, non-limiting examples are discussed below.

56.     IV has only identified independent claim 7 of the 844 Patent as asserted. Claim 7 recites:[1]

7. A method for providing data to a plurality of ***compute nodes***, comprising:

---

[1] All emphasis in quotations has been added unless otherwise noted.

19

storing blocks of a root image of said compute nodes on a first storage unit;

storing *leaf images* for respective compute nodes on respective second storage units, *said leaf images including only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes*;

and caching blocks of said root image that have been accessed by at least one of said compute nodes in a cache memory.

57.     With respect to the "leaf image" limitation recited in each independent claim of the 844 Patent, this "leaf image" includes "only additional data blocks not previously contained in said[/the] root image and changes made by respective compute nodes to the blocks of the root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes."

58.     IV alleges that as a part of the 844 Accused System "Docker stores leaf images including thin R/W layer in a runnable container for respective compute nodes," "Docker includes a writable per runnable container layer for new data such as new files and including a copy on write strategy for changes made to the blocks of the root image," and "Docker contains a writable layer using copy on write, leaving unchanged image data in their original image layers." Ex. 22 at 12, 20, 25. According to IV, the thin R/W layer in a runnable Docker container layer (accused "leaf image"), the read-only layers in a Docker image layer (accused "root image"), and Docker's copy on write approach to the R/W layer that leaves unchanged data in the original image layer (accused "only additional data blocks not [] in [the root image] ... and changes made ... to the blocks of the root image," but "not []blocks of [the] root image that are unchanged") are illustrated by the figures below from the Docker documentation:

20



Source: https://docs.docker.com/storage/storagedriver/.



Source: https://docs.docker.com/engine/storage/drivers/overlayfs-driver/.

*See, e.g.*, Ex. 22 at 16, 28.

59.    The Accused 844 System and Docker, however, do not infringe the 844 Patent's recited limitation a "leaf image" that includes "only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes." For example, documentation

21

indicates that Docker's thin R/W layer in a runnable container (accused "leaf image") does not include only additional data blocks not previously contained in the read-only layers of a Docker image (accused "root image"), only changes made by respective compute nodes to the read-only layers of a Docker image and no blocks of the read-only layers of a Docker image that are unchanged by respective compute nodes (accused "only additional data blocks not [] in [the root image] ... and changes made ... to the blocks of the root image," but "not []blocks of [the] root image that are unchanged"). Documentation states that modified files created in Docker's thin R/W layer contain the entire file from the read-only layers of a Docker image, not only the modified data for the file. *See* https://docs.docker.com/engine/storage/drivers/overlayfs-driver/. Indeed, the Docker figure that IV cites above specifically shows "file 2" from the read-only "image layer" (accused "root image") as being the "same file" contained in the read/write "container layer" (accused "leaf image"). *See id.* ("Where the image layer and the container layer contain the same files, the container layer (upperdir) takes precedence and obscures the existence of the same files in the image layer. ... The image's layers are the lowerdirs in the overlay and are read-only. The new directory for the container is the upperdir and is writable."). As another example of non-infringement, each independent claim of the 844 Patent also requires a plurality of "compute nodes." The 844 Patent specification explains "[i]n its most basic configuration, compute node 100 typically includes at least one processing unit 102 and memory 104." 844 Patent 4:29-31, Fig. 1. IV alleges that as a part of the 844 Accused System Docker "containers" correspond to the plurality of "compute nodes." *See* Ex. 22 at 3-4. The accused Docker containers (i.e., process/files/software), however, do not infringe at least because they are not "compute nodes" having a processor and memory. *See, e.g.,* https://docs.docker.com/get-started/docker-concepts/the-basics/what-is-a-container/ ("Without getting too deep, a VM is an entire operating

system with its own kernel, hardware drivers, programs, and applications. Spinning up a VM only to isolate a single application is a lot of overhead. A container is simply an isolated process with all of the files it needs to run."); https://www.docker.com/resources/what-container/ ("A container is a standard unit of software....").

60.     At least because of the absence of the "leaf image" and "compute nodes" as discussed above, Travelers does not directly infringe the 844 Patent, either literally or under the doctrine of equivalents.

61.     Likewise, at least because there is no direct infringement, Travelers does not indirectly infringe the 844 Patent, including no induced or contributory infringement of the 844 Patent.

62.     Absent a declaration of non-infringement, IV will continue to wrongfully allege that Travelers infringes the 844 Patent, and thereby cause Travelers irreparable injury and damage.

63.     For at least these reasons, an actual, justiciable, substantial, immediate, and continuing controversy exists between Travelers and IV regarding whether Travelers infringes or has infringed the 844 Patent.

64.     Travelers therefore seeks a judicial declaration under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., finding that Travelers (including through its alleged use of the 844 Accused System and Docker) does not infringe the 844 Patent.

**COUNT II**
**DECLARATION OF NON-INFRINGEMENT OF THE 785 PATENT**

65.     Travelers incorporates by reference paragraphs 1-50 as if fully set forth herein.

66.     The 785 Patent is titled "Secure Virtual Community Network." The 785 Patent's Abstract states:

23

A private virtual dynamic network is provided for computing devices coupled to public networks or private networks. This enables computing devices anywhere in the world to join into private enterprise intranets and communicate with each other. In one embodiment, the present invention provides a separate private virtual address realm, seen to each user as a private network, while seamlessly crossing public and private network boundaries. One implementation of the present invention uses an agent to enable an entity to participate in the network without requiring the member to add new hardware or software.

67. IV has asserted that third-party software called Kubernetes that IV alleges Travelers is using (the "785 Accused System") infringes the 785 Patent. In particular, IV asserts that Travelers "makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import" the 785 Accused System in a manner that infringes Claim 30 of the 785 Patent. *See* Exs. 15, 18.

68. Contrary to IV's assertions, Travelers has not infringed and does not infringe, under any theory of infringement (including directly (whether individually or jointly), indirectly (whether contributorily or by inducement), and/or under the doctrine of equivalents), any claim of the 785 Patent, including through any making, use, offering to sell, selling, and/or importing of the 785 Accused System or Kubernetes, at least because the 785 Accused System and Kubernetes does not employ, incorporate, use, or otherwise include all of the limitations of the 785 Patent's claims. IV's infringement contentions for the 785 Patent (Ex. 23) also fail to show any infringement by the 785 Accused System or Kubernetes.

69. Although there are additional reasons why Travelers, the 785 Accused System, and Kubernetes do not infringe the 785 Patent, non-limiting examples are discussed below.

70. IV has only identified independent Claim 30 of the 785 Patent as asserted. Claim 30 recites:

24

30. A virtual network manager, comprising:

a network interface configured for data communication *via a virtual network that is defined by a domain name having an associated public network address*;

a memory and a processor to implement a register module configured to *register devices* in a virtual network, the register module further configured to:

receive a registration request from an agent associated with a device;

distribute a virtual network address to the device when the device is registered in the virtual network, the device being identified to other devices in the virtual network by the virtual network address; and

a DNS server for the virtual network, the DNS server configured to receive a DNS request from a first device in the virtual network, and return a network address associated with a network route director, a private network address associated with a second device in the virtual network, and a virtual network address associated with the second device.

The 785 Patent "depicts a block diagram of an implementation of the system of the present invention" in Fig. 4. 785 Patent 8:6-7.



"FIG. 4 shows a computer or device B (host name-b.COb.com) in a first private domain and computer or device A (host name- a.COa.com) in a second private domain, both of which are coupled to the Internet by firewall devices 402, 404. The firewall devices are configured to

implement Network Address Translation (NAT). A and B have dynamic or static private IP addresses. Computer or device X is coupled directly to the public Internet and has a public IP address." *Id.* 9:9-17. "A hardware architecture for the machines, server or other devices used to implement the present invention should be well understood to one of average skill in the art. Suitable hardware includes one or more processors, a memory, a mass storage device, a portable storage device, a first network interface, a second network interface and I/O devices, in communication with each other." *Id.* 9:42-48. "For some devices, additional software or hardware cannot be installed on a member device or it is not desirable to install such additional software or hardware on the device. For such devices, a Group Agent can be used. The Group Agent acts as a proxy for one or more members of a virtual community without requiring installation of member agent software on the client devices." *Id.* 7:6-12.

71.     IV alleges that as part of the 785 Accused System Kubernetes is "configured to register devices in a virtual network" because the "Kubernetes DNS Service module watches the Kubernetes API for incoming new services and creates a set of DNS records for each of the pods associated with the service." Ex. 23 at 7. According to IV, Kubernetes "pods" are the accused "devices" that Kubernetes registers in the virtual network, which IV illustrates by quoting the portions of the Kubernetes documentation below:

> Kubernetes runs your workload by placing containers into Pods to run on *Nodes*. A node may be a virtual or physical machine, depending on the cluster. Each node is managed by the control plane and contains the services necessary to run Pods.

Source: https://kubernetes.io/docs/concepts/architecture/nodes.

**DNS** 🔗

You can (and almost always should) set up a DNS service for your Kubernetes cluster using an add-on.

A cluster-aware DNS server, such as CoreDNS, watches the Kubernetes API for new Services and creates a set of DNS records for each one. If DNS has been enabled throughout your cluster then all Pods should automatically be able to resolve Services by their DNS name.

For example, if you have a Service called `my-service` in a Kubernetes namespace `my-ns`, the control plane and the DNS Service acting together create a DNS record for `my-service.my-ns`. Pods in the `my-ns` namespace should be able to find the service by doing a name lookup for `my-service` (`my-service.my-ns` would also work).

Source: https://kubernetes.io/docs/concepts/services-networking/service.

**Services in Kubernetes**

The Service API, part of Kubernetes, is an abstraction to help you expose groups of Pods over a network. Each Service object defines a logical set of endpoints (usually these endpoints are Pods) along with a policy about how to make those pods accessible.

For example, consider a stateless image-processing backend which is running with 3 replicas. Those replicas are fungible—frontends do not care which backend they use. While the actual Pods that compose the backend set may change, the frontend clients should not need to be aware of that, nor should they need to keep track of the set of backends themselves.

The Service abstraction enables this decoupling.

The set of Pods targeted by a Service is usually determined by a selector that you define. To learn about other ways to define Service endpoints, see Services without selectors.

Ex. 23 at 7-8 (all emphasis added by IV).

72.     The Kubernetes documentation that IV relies upon describes Kubernetes "containers," "pods," and "services" as follows:

# Containers

Technology for packaging an application along with its runtime dependencies.

\* \* \*

Containers decouple applications from the underlying host infrastructure. This makes deployment easier in different cloud or OS environments.

Each node in a Kubernetes cluster runs the containers that form the Pods assigned to that node. Containers in a Pod are co-located and co-scheduled to run on the same node.

27

https://kubernetes.io/docs/concepts/containers/

## Pods

*Pods* are the smallest deployable units of computing that you can create and manage in Kubernetes.

A *Pod* (as in a pod of whales or pea pod) is a group of one or more containers, with shared storage and network resources, and a specification for how to run the containers. A Pod's contents are always co-located and co-scheduled, and run in a shared context. A Pod models an application-specific "logical host": it contains one or more application containers which are relatively tightly coupled. In non-cloud contexts, applications executed on the same physical or virtual machine are analogous to cloud applications executed on the same logical host.

https://kubernetes.io/docs/concepts/workloads/pods/ and

## Service

Expose an application running in your cluster behind a single outward-facing endpoint, even when the workload is split across multiple backends.

In Kubernetes, a Service is a method for exposing a network application that is running as one or more Pods in your cluster.

https://kubernetes.io/docs/concepts/services-networking/service/.

73.    The 785 Accused System and Kubernetes, however, do not infringe the 785 Patent's register "devices" in a virtual network limitation. For example, the documentation above shows that the accused Kubernetes pods are not "devices" (e.g., hardware that includes processors, memory, and storage) as claimed by Claim 30 of the 785 Patent.

74.    As another example of non-infringement, Claim 30 of the 785 Patent requires a network interface configured for data communication "via a virtual network that is defined by a domain name having an associated public network address."

28

75.    IV alleges that as part of the 785 Accused System Kubernetes "is implemented in part through a network interface called kube-proxy, which maintains network rules that allow communication to pods from network sessions. Kube-proxy communications can relate to network sessions inside or outside of the cluster in which the services are defined. The services defined in the cluster are assigned DNS names having an associated public network address." Ex. 23 at 5. IV alleges the virtual network "defined by a domain name having an associated public network address" corresponds to external IP addresses that can be configured in Kubernetes:

### External IPs

If there are external IPs that route to one or more cluster nodes, Kubernetes Services can be exposed on those `externalIPs`. When network traffic arrives into the cluster, with the external IP (as destination IP) and the port matching that Service, rules and routes that Kubernetes has configured ensure that the traffic is routed to one of the endpoints for that Service.

Source: https://kubernetes.io/docs/concepts/services-networking/service/.

### DNS for Services and Pods

Kubernetes creates DNS records for Services and Pods. You can contact Services with consistent DNS names instead of IP addresses.

Services defined in the cluster are assigned DNS names. By default, a client Pod's DNS search list includes the Pod's own namespace and the cluster's default domain.

Source: https://kubernetes.io/docs/concepts/services-networking/dns-pod-service/#pod-s-dns-config.

Ex. 23 at 6-7 (all emphasis added by IV).

76.    The 785 Accused System and Kubernetes, however, does not infringe the 785 Patent's limitation a network interface configured for data communication "via a virtual network that is defined by a domain name having an associated public network address." For example, the 785 Accused System and Kubernetes at Travelers does not include a virtual network that is defined by a domain name having an associated public network address.

29

77.    At least because of the absence of the "devices" registered in a virtual network and the network interface configured for data communication "via a virtual network that is defined by a domain name having an associated public network address" as discussed above, Travelers does not directly infringe the 785 Patent, either literally or under the doctrine of equivalents.

78.    Likewise, at least because there is no direct infringement, Travelers does not indirectly infringe the 785 Patent, including no induced or contributory infringement of the 785 Patent.

79.    Absent a declaration of non-infringement, IV will continue to wrongfully allege that Travelers infringes the 785 Patent and thereby cause Travelers irreparable injury and damage.

80.    For at least these reasons, an actual, justiciable, substantial, immediate, and continuing controversy exists between Travelers and IV regarding whether Travelers infringes or has infringed the 785 Patent.

81.    Travelers therefore seeks a judicial declaration under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., finding that Travelers (including through its alleged use of the 785 Accused System and Kubernetes) does not infringe the 785 Patent.

**COUNT III**
**DECLARATION OF NON-INFRINGEMENT OF THE 722 PATENT**

82.    Travelers incorporates by reference paragraphs 1-50 as if fully set forth herein.

83.    The 722 Patent is titled "Asynchronous Messaging Using a Node Specialization Architecture in the Dynamic Routing Network." The 722 Patent's Abstract states:

> A network routes update messages containing updates to properties of live objects from input sources to clients having the objects. When the clients receive live objects, the clients identify the object IDs associated with the objects and register the object IDs with the routing network. The routing network is adapted to selectively send update messages to nodes in the network and the nodes forward the messages to the clients. One implementation uses a hierarchy of registries to indicate which nodes and clients receive which update messages. Another

30

implementation assigns update messages to one or more of N categories and nodes to one or more of M types, and the gateways maintain mapping between categories and types. To ensure that clients receive all of the update messages for which they register, the clients connect to client proxies that in turn connect to at least one node of each type.

84. IV has asserted that third-party software called Kafka that IV alleges Travelers is using (the "722 Accused System") infringes the 722 Patent. In particular, IV asserts that Travelers "makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import" the 722 Accused System in a manner that infringes Claim 14 of the 722 Patent. *See* Exs. 15, 18.

85. Contrary to IV's assertions, Travelers has not infringed and does not infringe, under any theory of infringement (including directly (whether individually or jointly), indirectly (whether contributorily or by inducement), and/or under the doctrine of equivalents), any claim of the 722 Patent, including through any making, use, offering to sell, selling, and/or importing of the 722 Accused System or Kafka, at least because the 722 Accused System and Kafka do not employ, incorporate, use, or otherwise include all of the limitations of the 722 Patent's claims. IV's infringement contentions for the 722 Patent (Ex. 24) also fail to show any infringement by the 722 Accused System or Kafka.

86. Although there are additional reasons why Travelers, the 722 Accused System, and Kafka do not infringe the 722 Patent, non-limiting examples are discussed below. IV has only identified independent Claim 14 of the 722 Patent as asserted. Claim 14 recites:

14. A method comprising:

providing, using a processing device of an input source, a data representation to a client device, different from the input source, coupled to a routing network, wherein the data representation includes at least one ***live object*** recognizable by the client device, and causing the client device to respond to the live object of the data representation by determining an object identifier (ID) of the live object and to register for updates of the live object with the routing network

such that registering the client device with the routing network provides client connection information to a node in the routing network; and

sending, using the processing device of the input source, an update message to the routing network, wherein the update message identifies the live object and contains update data that updates a property of the live object,

wherein a gateway device at the routing network is configured to identify a category of the update message based on the input source, to determine a node type to which the identified category maps, and to route the update message to the node, having the node type, at the routing network,

wherein the node is configured to identify the client device as a registered device and to route the update message to the client device, and

wherein the client device processes the update message upon receipt *to update* the property of the live object at the client device.

87.    Claim 14, as shown above, requires, *inter alia*, a "live object" provided to or recognizable by a client device, and also requires that the client device "update" a property of the live object at the client device. The "live object" may be identified by an "object identifier (ID)." *See* Claim 14 (providing "a data representation to a client device ... wherein the data representation includes at least one live object recognizable by the client device, and causing the client device to respond to the live object of the data representation by determining an object identifier (ID) of the live object and to register for updates of the live object with the routing network ... and wherein the client device processes the update message upon receipt to update the property of the live object at the client device.

88.    IV alleges that as part of the 722 Accused System Kafka "topics" correspond to the 722 Patent's "live object" provided to Kafka "consumers" that correspond to the 722 Patent's "client device." IV alleges "Kafka includes a Producer API that allows applications to publish streams of records [to one or more Kafka topics], and a Consumer API that allows applications to subscribe to one or more topics and process streams of records produced to them." Ex. 24 at 6. Citing to the Kafka documentation below, IV alleges "Kafka topics are divided into partitions, and

Kafka uses offsets that act as an identifier of a record within a partition and denotes the position of the consumer to the partition." Ex. 24 at 13.



Ex. 24 at 14 (all emphasis added by IV). In connection with the "Anatomy of a Topic" figure IV relies upon, the Kafka documentation states that "[a] topic is a category or feed name to which records are published. Topics in Kafka are always multi-subscriber; that is, a topic can have zero, one, or many consumers that subscribe to the data written to it. ... Each partition is an ordered, immutable sequence of records that is continually appended to-a structured commit log." https://kafka.apache.org/20/documentation.html#intro_topics.

89.     IV alleges the Kafka topics (accused "live object") are stored on a server (e.g., Kafka cluster), and the Kafka topics on the server are read by a client (e.g., Kafka consumer) (accused "client device"), as shown in the figures below. *See* Ex. 24 at 17, 36-37.



Source: https://kafka.apache.org/20/documentation.html.

Ex. 24 at 17 (all emphasis added by IV). The Kafka documentation IV cites describes the above figure as showing "[a] two server Kafka cluster hosting four partitions (P0-P3) with two consumer groups. Consumer group A has two consumer instances and group B has four." https://kafka.apache.org/20/documentation.html#intro_consumers. Similarly, IV points to another figure to allege that Kafka producers write to topics on a Kafka server and Kafka consumer clients read from these topics on the Kafka server:



Source: https://www.cloudkarafka.com/blog/part1-kafka-for-beginners-what-is-apache-kafka.html.

Ex. 24 at 24 (all emphasis added by IV).

90.    At the Kafka consumer (accused "client device" that must "update" a property of the live object at the client device), IV alleges "Kafka Consumers can set a list of topics [on the Kafka server] that it wants to subscribe through subscribe APIs. Kafka delivers messages in a topic to those consumers that are subscribed to the topic. Kafka Consumers process messages that are received via a Kafka broker," as illustrated below. Ex. 24 at 32.



Source: Kafka: The Definitive Guide (2nd Ed.), O'Reilly Publishing (2021).

Ex. 24 at 36 (all emphasis added by IV).

91.     The 722 Accused System and Kafka, however, do not infringe the 722 Patent's limitations a "live object" provided to or recognizable by a client device, and a client device that "updates" a property of the live object at the client device. For example, Kafka consumers (accused "client device") do not "update" Kafka topics (accused "live object') at the Kafka consumer (accused "the client device processes the update message upon receipt to update the property of the live object at the client device"). Moreover, records in Kafka topics (accused "live object') cannot be "updated" because Kafka topics are "an ordered, immutable sequence of records that is continually appended to – [i.e.,] a structured commit log." *See* https://kafka.apache.org/20/documentation.html#intro_topics

92.     At least because of the absence of the "live object" and client device that "updates" a property of the live object at the client device as discussed above, Travelers does not directly infringe the 722 Patent, either literally or under the doctrine of equivalents.

93.     Likewise, at least because there is no direct infringement, Travelers does not indirectly infringe the 722 Patent, including no induced or contributory infringement of the 722 Patent.

94.     Absent a declaration of non-infringement, IV will continue to wrongfully allege that Travelers infringes the 722 Patent, and thereby cause Travelers irreparable injury and damage.

95.     For at least these reasons, an actual, justiciable, substantial, immediate, and continuing controversy exists between Travelers and IV regarding whether Travelers infringes or has infringed the 722 Patent.

36

96.   Travelers therefore seeks a judicial declaration under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, finding that Travelers (including through its alleged use of the 722 Accused System and Kafka) does not infringe the 722 Patent.

**COUNT IV**
**DECLARATION OF NON-INFRINGEMENT OF THE 582 PATENT**

97.   Travelers incorporates by reference paragraphs 1-50 as if fully set forth herein.

98.   The 582 Patent is titled "Load Balancing With Shared Data." The 582 Patent's Abstract states:

> The input of a computer executable process, is logically Subdivided, without reading, into a plurality of partitions which are distributed to a plurality of processors in which respective subtasks including the reading of those partitions, are carried out. The method allows distribution of processing of a large amount of data to a plurality of processors cooperating in a way that the load imposed on each processor is proportional to its capacity to do the work. The input of a computer executable process, is logically subdivided, without reading, into a plurality of partitions which are distributed to a plurality of processors in which respective subtasks including the reading of those partitions, are carried out. The method allows distribution of processing of a large amount of data to a plurality of processors cooperating in a way that the load imposed on each processor is proportional to its capacity to do the work.

99.   IV has asserted that third-party software called Spark that IV alleges Travelers is using (the "582 Accused System") infringes the 582 Patent. In particular, IV asserts that Travelers "makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import" the 582 Accused System in a manner that infringes Claim 1 of the 582 Patent. *See* Exs. 15, 18.

100.   Contrary to IV's assertions, Travelers has not infringed and does not infringe, under any theory of infringement (including directly (whether individually or jointly), indirectly (whether contributorily or by inducement), and/or under the doctrine of equivalents), any claim of the 582 Patent, including through any making, use, offering to sell, selling, and/or importing of the

582 Accused System or Spark, at least because the 582 Accused System and Spark do not employ, incorporate, use, or otherwise include all of the limitations of the 582 Patent's claims. IV's infringement contentions for the 582 Patent (Ex. 25) also fail to show any infringement by the 582 Accused System or Spark.

101.    Although there are additional reasons why Travelers, the 582 Accused System, and Spark do not infringe the 582 Patent, non-limiting examples are discussed below.

102.    The sole independent claim of the 582 Patent recites:

1. A method of effecting on a preexisting input file a computer-executable process comprised of a plurality of subtasks, the method comprising the steps of:

(a) automatically determining file allocation and logically subdividing records of said input file into a plurality of partitions;

(b) *distributing descriptions of __all__* of said partitions *to __each__* of a plurality of subtask processors [sic]

(c) [sic] simultaneously executing at least a respective one of the subtasks of the computer-executable process in each of at least some of said processors on a respective one of the partitions with each subtask reading and processing the respective partition so as to process the respective partition and produce respective subtask output and;

(d) [sic] thereafter *repeating step (c)* in at least some of the subtask processors each with another unprocessed partition *on a first-come/first-served basis*; and

(e) generating at least one output combining all of the subtask outputs and reflecting the processing of all of said subtasks.

103.    With respect to Claim 1's step (b) limitation ("distributing descriptions of all of said partitions to each of a plurality of subtask processors"), IV alleges that as a part of the 582 Accused System "Spark creates an [Resilient Distributed Dataset ('RDD')] from datasets including files," "[t]his process includes forming a logical division of the dataset," and "[a]n RDD results in an automatic file allocation across multiple nodes in a cluster, so that the nodes of the cluster can

operate on the RDD in parallel." Ex. 25 at 6. IV further alleges "Spark distributes partitions to clusters which includes multiple machines or nodes for processing." Ex. 25 at 7. According to IV, the Spark documentation below shows that Spark's RDD is split into "partitions" and that Spark distributes descriptions "of all" of said partitions "to each" of a plurality of subtask processors:

## Overview 🔗

At a high level, every Spark application consists of a *driver program* that runs the user's main function and executes various *parallel operations* on a cluster. The main abstraction Spark provides is a *resilient distributed dataset* (RDD), which is a collection of elements partitioned across the nodes of the cluster that can be operated on in parallel. RDDs are created by starting with a file in the Hadoop file system (or any other Hadoop-supported file system), or an existing Scala collection in the driver program, and transforming it. Users may also ask Spark to *persist* an RDD in memory, allowing it to be reused efficiently across parallel operations. Finally, RDDs automatically recover from node failures.

Source: https://spark.apache.org/docs/latest/rdd-programming-guide.html.

One important parameter for parallel collections is the number of *partitions* to cut the dataset into. Spark will run one task for each partition of the cluster. Typically you want 2-4 partitions for each CPU in your cluster. Normally, Spark tries to set the number of partitions automatically based on your cluster. However, you can also set it manually by passing it as a second parameter to parallelize (e.g. sc.parallelize(data, 10)). Note: some places in the code use the term slices (a synonym for partitions) to maintain backward compatibility.

Source: https://spark.apache.org/docs/latest/rdd-programming-guide.html.

Apache Spark's Resilient Distributed Datasets (RDD) are a collection of various data that are so big in size, that they cannot fit into a single node and should be partitioned across various nodes. Apache Spark automatically partitions RDDs and distributes the partitions across different nodes. They are evaluated lazily (i.e, the execution will not start until an action is triggered which increases manageability, saves computation and thus increases optimization and speed) and the transformations are stored as directed acyclic graphs (DAG). So, every action on the RDD will make Apache Spark recompute the DAG.

Source: https://www.talend.com/resources/intro-apache-spark-partitioning/.

Ex. 25 at 7.

104.    The Accused 582 System and Spark, however, do not infringe the 582 Patent's step (b) limitation of distributing "descriptions" "of all" of said partitions "to each" of a plurality of subtask processors. For example, the portion of a Spark RDD (accused "partitions") at each Spark compute node does not include a description of the RDD at all, much less a description of the entire RDD (accused distributing "descriptions" "of all" of said partitions "to each" of a plurality of subtask processors), at least because Spark's RDD "is a collection of elements [(i.e., data, not

39

descriptions of data)" distributed across the nodes. *See* https://spark.apache.org/docs/latest/rdd-programming-guide.html#overview.

105.    With respect to Claim 1's step (d) limitation ("repeating step (c) [(subtask processor reads partition and processes partition to produce output)] in at least some of the subtask processors each with another unprocessed partition on a first-come/first-served basis"), IV alleges that as a part of the 582 Accused System "Spark task output produced by each worker node is combined to produce processed output for the related partition," as illustrated below. Ex. 25 at 12.



Source: https://spark.apache.org/docs/latest/cluster-overview.html.

By default, Spark's scheduler runs jobs in FIFO fashion. Each job is divided into "stages" (e.g. map and reduce phases), and the first job gets priority on all available resources while its stages have tasks to launch, then the second job gets priority, etc. If the jobs at the head of the queue don't need to use the whole cluster, later jobs can start to run right away, but if the jobs at the head of the queue are large, then later jobs may be delayed significantly.

Source: https://spark.apache.org/docs/latest/job-scheduling.html.

In Spark, data is generally not distributed across partitions to be in the necessary place for a specific operation. During computations, a single task will operate on a single partition – thus, to organize all the data for a single reduceByKey reduce task to execute, Spark needs to perform an all-to-all operation. It must read from all partitions to find all the values for all keys, and then bring together values across partitions to compute the final result for each key – this is called the **shuffle**.

Source: https://spark.apache.org/docs/latest/rdd-programming-guide.html.

Ex. 25 at 13-14.

106.    The Accused 582 System and Spark, however, do not infringe the 582 Patent's step (d) limitation of "thereafter repeating step (c) [(subtask processor reads partition and processes partition to produce output)] in at least some of the subtask processors each with another unprocessed partition on a first-come/first-served basis" for several reasons. For example, a task on a particular Spark worker node does not read and process unprocessed portions of the RDD that are located outside of that particular Spark worker node (accused "repeating step (c) [(subtask processor reads partition and processes partition to produce output)] in at least some of the subtask processors each with another unprocessed partition on a first-come/first-served basis"). Rather, documentation states that during computations in Spark, a single task on a Spark worker node operates on the portion of the RDD on that worker node. *See* https://spark.apache.org/docs/latest/rdd-programming-guide.html#shuffle-operations.

107.    The 582 Accused System and Spark also do not perform the step (d) limitation of "thereafter repeating step (c) [(subtasks on processors read and process respective partitions)] in at least some of the subtask processors each with another unprocessed partition on a first-come/first-served basis" for another reason. In the 582 Patent at step (c), the subtasks read and process their respective partitions/data simultaneously to do the processing work faster; and then in step (d), subtasks that have finished their processing work repeatedly ask for unprocessed partitions/data and then read and process the unprocessed partitions/data on a first-come/first-served basis until all of the processing work is done. *See, e.g.*, 582 Patent 3:67-4:3, 6:14-22, Fig. 4. The 582 Accused System and Spark, however, does not infringe because Spark worker nodes do not request or pull new processing jobs on their own. *See e.g.,* https://spark.apache.org/docs/latest/job-scheduling.html.

41

108.    At least because of the absence of the limitations at step (b) for distributing "descriptions" "of all" of said partitions "to each" of a plurality of subtask processors and at step (d) for "repeating step (c) [(subtask processor reads partition and processes partition to produce output)] in at least some of the subtask processors each with another unprocessed partition on a first-come/first-served basis" as discussed above, Travelers does not directly infringe the 582 Patent, either literally or under the doctrine of equivalents.

109.    Likewise, at least because there is no direct infringement, Travelers does not indirectly infringe the 582 Patent, including no induced or contributory infringement of the 582 Patent.

110.    Absent a declaration of non-infringement, IV will continue to wrongfully allege that Travelers infringes the 582 Patent, and thereby cause Travelers irreparable injury and damage.

111.    For at least these reasons, an actual, justiciable, substantial, immediate, and continuing controversy exists between Travelers and IV regarding whether Travelers infringes or has infringed the 582 Patent.

112.    Travelers therefore seeks a judicial declaration under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., finding that Travelers (including through its alleged use of the 582 Accused System and Spark) does not infringe the 582 Patent.

**COUNT V**
**DECLARATION OF NON-INFRINGEMENT OF THE 080 PATENT**

113.    Travelers incorporates by reference paragraphs 1-50 as if fully set forth herein.

114.    The 080 Patent is titled "Systems and Methods for Parallel Distributed Programming." The 080 Patent's Abstract states:

> The present invention relates generally to computer programming, and more particularly to systems and methods for parallel distributed programming. Generally, a parallel distributed program is configured to operate across multiple

42

processors and multiple memories. In one aspect of the invention, a parallel distributed program includes a distributed shared variable located across the multiple memories and distributed programs capable of operating across multiple processors.

115. IV has asserted that third-party software called Airflow that IV alleges Travelers is using (the "080 Accused System") infringes the 080 Patent. In particular, IV asserts that Travelers "makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import" the 080 Accused System in a manner that infringes Claim 9 of the 080 Patent. *See* Ex. 17.

116. IV has not provided further details on the 080 Accused System's or Airflow's alleged infringement of the 080 Patent, but IV has asserted the 080 Patent against third-party software called Spark, which documentation states integrates with Airflow. *See, e.g.*, https://pypi.org/project/apache-airflow-providers-apache-spark/ (Apache Airflow provides official integration with Apache Spark through the *apache-airflow-providers-apache-spark* provider package) (Spark together with Airflow, also part of the "080 Accused System" hereinafter). *See, e.g.*, IV's 080 Patent infringement contentions in *IV v. American Airlines* (Ex. 26).

117. Contrary to IV's assertions, Travelers has not infringed and does not infringe, under any theory of infringement (including directly (whether individually or jointly), indirectly (whether contributorily or by inducement), and/or under the doctrine of equivalents), any claim of the 080 Patent, including through any making, use, offering to sell, selling, and/or importing of the 080 Accused System, Airflow, or Spark, at least because the 080 Accused System, Airflow, and Spark do not employ, incorporate, use, or otherwise include all of the limitations of the 080 Patent's claims. IV's infringement contentions for the 080 Patent (Ex. 26) vs. Spark also fail to show any infringement by the 080 Accused System or Spark.

118.   Although there are additional reasons why Travelers, the 080 Accused System, Airflow, and Spark do not infringe the 080 Patent, non-limiting examples are discussed below.

119.   IV has only identified independent claim 9 of the 080 Patent as asserted. Claim 9 recites:

> 9. A distributed parallel computing system, having at least one memory area and at least one processor, comprising:
>
> at least one ***distributed shared variable*** capable of loading into the at least one memory area, wherein the at least one distributed shared variable is a single variable that includes several variables that may be physically loaded into the at least one memory area; and
>
> at least one distributed sequential computing program, configured to operate in the at least one processor, configured to access the at least one distributed shared variable, and ***configured to transform into at least one distributed parallel computing program by spawning*** at least one child distributed sequential computing system program when at least one intermediate condition occurs within the at least one distributed sequential program, wherein the at least one distributed parallel computing program concurrently uses the at least one distributed sequential computing program and the at least one spawned child distributed sequential computing program to perform parallel processing and/or operations, wherein the at least one intermediate condition comprising one intermediate result that will be required by the at least one spawned child distributed sequential computing program to continue computation.

120.   With respect to the "distributed shared variable" ("DSV") limitation, the 080 Patent specification explains that a "distributed shared variable" ("DSV") is "logically a single variable that includes several variables that may be physically distributed across multiple memories." 080 Patent 3:37-39. As an example, the specification describes a global array "A[.]" where "members A[0] to A[x/2] may be located in the memory of Processor 1 and A[(x/2)+1] to A[x] may be located in the memory of Processor 2." *Id.* 3:39-41. The specification explains that in the program below the DSV A[i] on each processor will be "assign[ed] the value of the previous member and increment[ed] by one" (i.e., the DSV A[i] is read/write, not read-only). *See id.* 5:30-47 ("In this program, the task will (1) count from 2 to x, and for each count, the task will (2) assign the value of the member of the previous count i-1 to the variable t. This variable t is referred to as 'agent

variable,' and is accessible by its owner thread from anywhere. (3) If the count [of x] reaches one more than half of the array A, then that means the task needs to access the other half of the array A[.] in P2. Thus, the task will (4) 'hop' or migrate to P2 and continue its computation. If not, then the task will continue its computation on Pl, and (5) assign the value of the previous member and increment it by one.").

```
(1)  for i = 2 to x
(2)        t = A[i − 1]
(3)        if i == x/2 + 1
(4)              hop (P2)
(5)        A[i] = t + 1
(6)  end for
```

121.    IV alleges the 080 Patent's "DSV" limitation corresponds to Spark's "Resilient Distributed Datasets" ("RDDs") described in the Spark documentation below that IV alleges "operate in parallel," "are partitioned across multiple nodes," and are "processed across at least one memory area." *See* Ex. 26 at 6-7.

## Resilient Distributed Datasets (RDDs) 🔗

Spark revolves around the concept of a *resilient distributed dataset* (RDD), which is a fault-tolerant collection of elements that can be operated on in parallel. There are two ways to create RDDs: *parallelizing* an existing collection in your driver program, or referencing a dataset in an external storage system, such as a shared filesystem, HDFS, HBase, or any data source offering a Hadoop InputFormat.

Source: https://spark.apache.org/docs/latest/rdd-programming-guide.html.

**RDDs — Partitions**

- RDDs are designed to contain huge amounts of data , that cannot fit onto one single machine → hence, the data has to be partitioned across multiple machines/nodes

- Spark automatically partitions RDDs and distributes the partitions across different nodes

- A partition in spark is an atomic chunk of data stored on a node in the cluster

- Partitions are basic units of parallelism in Apache Spark

- RDDs in Apache Spark are collection of partitions

- Operations on RDDs automatically place tasks into partitions, maintaining the locality of persisted data

Source: https://blog.k2datascience.com/batch-processing-apache-spark-a67016008167.

## Parallelism

Parallelism in Spark is all about doing multiple things at the same time. The core idea is to divide the data into smaller chunks (partitions), so they can be processed simultaneously. The more partitions you have, the more tasks can run in parallel, leading to faster processing times.

Source: https://dataengineerinterview.substack.com/p/a-deep-dive-into-apache-spark-partitioning.

122.    According to documentation, when Spark integrates with Airflow in the "apache-airflow-providers-apache-spark" package, Airflow invokes Spark as an application. *See* https://www.projectpro.io/recipes/use-sparksubmitoperator-airflow-dag ("The Apache Airflow SparkSubmitOperator is an operator that allows you to run Spark jobs from within your Airflow DAGs. It is a wrapper around the spark-submit binary."). The operator functions by calling the SparkSubmitHook to construct and execute the spark-submit command. *See* https://airflow.apache.org/docs/apache-airflow-providers-apache-spark/stable/_api/airflow/providers/apache/spark/operators/spark_submit/index.html ("Call the SparkSubmitHook to run the provided spark job."). Documentation states this architecture means that "Airflow worker node acts like a Spark client" when submitting jobs. *See*

46

https://anittasaju1996.github.io/how-to-use-sshoperator-to-submit-jobs-from-airflow-to-spark-clusters-running-in-docker-containers/.

123.    The 080 Accused System, Airflow, and Spark, however, do not infringe the 080 Patent's "DSV" limitation because documentations shows that Spark's RDDs are immutable and read-only, whereas the 080 Patent's DSVs require read/write capability (i.e., the DSV is read/write). Contrary to IV's allegations, documentation states Spark's RDDs are immutable. *See* https://spark.apache.org/docs/latest/api/python/reference/api/pyspark.RDD.html (describing RDD as "an immutable, partitioned collection of elements that can be operated on in parallel."); *see also* https://spark.apache.org/docs/3.5.1/api/scala/org/apache/spark/rdd/RDD.html (RDD "[r]epresents an immutable, partitioned collection of elements that can be operated on in parallel."). Thus, according to Spark documentation, once an RDD is created, it cannot be modified and instead any operation that appears to modify an RDD actually creates a new RDD, leaving the original unchanged. *See* https://www.ibm.com/think/topics/resilient-distributed-dataset ("RDDs are immutable, meaning they cannot be modified after creation. Immutability helps the data remain stable over time throughout multiple operations."); https://www.tutorialspoint.com/apache_spark/apache_spark_rdd.htm ("Resilient Distributed Datasets (RDD) is a fundamental data structure of Spark. It is an immutable distributed collection of objects.... Formally, an RDD is a read-only, partitioned collection of records."); https://luminousmen.com/post/why-apache-spark-rdd-is-immutable/ ("RDDs are immutable — they cannot be changed once created and distributed across the cluster's memory.")

124.    At least because of the absence of the "distributed shared variable" limitation as discussed above, Travelers does not directly infringe the 080 Patent, either literally or under the doctrine of equivalents.

125.    Likewise, at least because there is no direct infringement, Travelers does not indirectly infringe the 080 Patent, including no induced or contributory infringement of the 080 Patent.

126.    Absent a declaration of non-infringement, IV will continue to wrongfully allege that Travelers infringes the 080 Patent, and thereby cause Travelers irreparable injury and damage.

127.    For at least these reasons, an actual, justiciable, substantial, immediate, and continuing controversy exists between Travelers and IV regarding whether Travelers infringes or has infringed the 080 Patent.

128.    Travelers therefore seeks a judicial declaration under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., finding that Travelers (including through its alleged use of the 080 Accused System, Airflow, and Spark) does not infringe the 080 Patent.

## COUNT VI
## DECLARATION OF NON-INFRINGEMENT OF THE 584 PATENT

129.    Travelers incorporates by reference paragraphs 1-50 as if fully set forth herein.

130.    The 584 Patent is titled "System for Hosting Customized Computing Clusters." The 584 Patent's Abstract states:

> A computer system for hosting computing clusters for clients. The system includes clusters each including a set of computing resources and each implemented in custom or differing configurations. Each of the configurations provides a customized computing environment for performing particular client tasks. The configurations may differ due to configuration of the processing nodes, the data storage, or the private cluster network or its connections. The system includes a monitoring system that monitors the clusters for operational problems on a cluster level and also on a per-node basis such as with monitors provided for each node. The system controls client access to the clusters via a public communications by only allowing clients to access their assigned cluster or the cluster configured per their specifications and performing their computing task. Gateway mechanisms isolate each cluster such that communications within a cluster or on a private cluster communications network are maintained separate.

48

131.    IV has asserted that third-party software called Kubernetes that IV alleges Travelers is using (the "584 Accused System") infringes the 584 Patent. In particular, IV asserts that Travelers "makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import" the 584 Accused System in a manner that infringes Claim 1 of the 584 Patent. *See* Exs. 17, 18.

132.    Contrary to IV's assertions, Travelers has not infringed and does not infringe, under any theory of infringement (including directly (whether individually or jointly), indirectly (whether contributorily or by inducement), and/or under the doctrine of equivalents), any claim of the 584 Patent, including through any making, use, offering to sell, selling, and/or importing of the 584 Accused System or Kubernetes, at least because the 584 Accused System and Kubernetes do not employ, incorporate, use, or otherwise include all of the limitations of the 584 Patent's claims. IV's infringement contentions for the 584 Patent (Ex. 27) also fail to show any infringement by the 584 Accused System or Kubernetes.

133.    Although there are additional reasons why Travelers, the 584 Accused System and Kubernetes do not infringe the 584 Patent, non-limiting examples are discussed below.

134.    IV has only identified independent Claim 1 of the 584 Patent as asserted. Claim 1 recites:

1. A computer system, comprising:

a private communications network linked to a public communication network;

a first cluster comprising a set of computing resources, including at least *one hardware processor*, in a first configuration, wherein the first cluster is communicatively linked to the private communications network;

a second cluster comprising a set of computing resources, including at least *one hardware processor*, in a second configuration, wherein the second cluster is communicatively linked to the private communications network; and

a monitoring system to monitor operations of the first cluster and the second cluster for communications problems;

wherein the first configuration differs from the second configuration;

wherein the first configuration provides a first computing environment to perform a first client task and the second configuration provides a second computing environment to perform a second client task; and

wherein the computing resources comprise processing nodes, data storage shared by the processing nodes, and at least one communications network to link the processing nodes to each other and to the data storage;

wherein the first cluster establishes communications between the set of computing resources of the first cluster and a first gateway communicatively linked between the first cluster and the private communications network;

wherein the second cluster establishes communications among the set of computing resources of the second cluster and a second gateway communicatively linked between the second cluster and the private communications network;

wherein communications between the first cluster and the second cluster are isolated;

wherein the first cluster is a high performance cluster; and

wherein the second cluster is a high performance cluster.

135.   With respect to the Claim 1's limitations of "a first cluster comprising a set of computing resources, including at least *one hardware processor*, in a first configuration, wherein the first cluster is communicatively linked to the private communications network," and "a second cluster comprising a set of computing resources, including at least *one hardware processor*, in a second configuration, wherein the second cluster is communicatively linked to the private communications network," IV alleges that as a part of the 584 Accused System "Kubernetes uses clusters, which are groups of nodes that run containerized applications on behalf of a client" and "include workload computing resources as processors and memory, and are connected to a private communications network. Ex. 27 at 11.

136.   IV accuses a Kubernetes "node" of meeting the "at least one hardware processor" limitation in Claim 1 because, according to the Kubernetes documentation below, "[a] node may be a virtual *or physical machine*, depending on the cluster" and is " a worker machine that contains

the necessary services to run pods, including the CPU and memory resources they need to run."

Ex. 27 at 11.

> A Kubernetes node is either a virtual or physical machine that one or more Kubernetes pods run on. It is a worker machine that contains the necessary services to run pods, including the CPU and memory resources they need to run.
>
> Source: https://www.cloudzero.com/blog/kubernetes-node-vs-pod/.

*See, e.g.,* Ex. 27 at 11.

137.    The prosecution history of the 584 Patent informs the understanding Claim 1's "at least one hardware processor" limitation. The 584 Patent is a continuation of application No. 11/927,921 ("the 921parent application"), which was filed on October 30, 2007 and issued as U.S. Pat. No. 7,822,841 ("the 841 Patent"), entitled "Method and system for hosting multiple, customized computing clusters." The 841 Patent is attached as Ex. 28 hereto.

138.    The "at least one hardware processor" limitation of Claim 1 of the 584 Patent is also found and derives from the 841 Patent, of which the 584 Patent was a continuation. Specifically, Claim 1 of the 841 Patent recites:

1. A computer system for hosting computing clusters for clients, comprising:
        a private communications network linked to a public communications network;
        a first cluster comprising a set of computing resources, including ***at least one hardware processor***, in a first configuration, wherein the first cluster is communicatively linked to the private communications network;
        a second cluster comprising a set of computing resources, including ***at least one hardware processor***, in a second configuration, wherein the second cluster is communicatively linked to the private communications network; and
        a monitoring system monitoring operations of the first and second clusters, identifying operational and connectivity problems, and issuing an alert in response to the identified problems indicating a corresponding one of the first and second clusters associated with the identified problems;
        wherein the first configuration differs from the second configuration and wherein the first configuration provides a first computing environment for performing a first client task and the second configuration provides a second computing environment for performing a second client task;
        wherein the monitoring system comprises a main monitor that operates to monitor the first and second clusters to identify the operation and connectivity

problems and further comprises monitors for each node of the first and second clusters operating to check for hardware and software problems within a particular node and to report the hardware and software problems to the main monitor.

139.     During prosecution of the 841 Patent, the examiner rejected the patentee's claims specifically because they did "not contain components that are limited to hardware." *See* 921 parent application, OA 2/25/2010 at 2-3 (attached as Ex. 29 hereto).

> 5.     Claims 1-8 are rejected under 35 U.S.C. 101 because the claimed invention is directed to a non-statutory subject matter. The claims 1-8 claim a system that does not contain components that are limited to hardware. Addition of --at least one hardware processing unit;-- (of the system) in the body of the claim for the claimed system is suggested to overcome the 35 U.S.C. 101 rejections.

140.     The patentee amended the claims to add "hardware processor." *See* 921 Application, Applicant's Amendment in Response to OA 2/25/10 (attached as Ex. 30 hereto) at 4, 9.

> Appl. No. 11/927,921
> Response to Office Action of February 25, 2010
>
> **Amendments to the Claims:**
>
> This listing of claims will replace all prior versions and listings of claims in the application:
>
> **Listing of Claims:**
>
> 1. (CURRENTLY AMENDED) A computer system for hosting computing clusters for clients, comprising:
>
> a private communications network linked to a public communications network;
>
> a first cluster comprising a set of computing resources, including at least one hardware processor, in a first configuration, wherein the first cluster is communicatively linked to the private communications network; and
>
> a second cluster comprising a set of computing resources, including at least one hardware processor, in a second configuration, wherein the second cluster is communicatively linked to the private communications network;
>
> wherein the first configuration differs from the second configuration and wherein the first configuration provides a first computing environment for performing a first client task and the second configuration provides a second computing environment for performing a second client task.

Ex. 30 at 4.

> **Claim Rejections Under 35 U.S.C. §101**
>
> Claims 1-8 are rejected under 35 U.S.C. §101 as being directed toward non-statutory subject matter. Independent claim 1 is amended to include hardware components. Claims 2-8 depend from claim 1, and, hence, the amendment of claim 1 is believed to address the rejection of these claims.

Ex. 30 at 9.

141.     The claims were allowed over the prior art as a result of patentee's amendment to add this "at least one hardware processor" limitation, expressly disclaiming in the process any software or virtualized processor as being able to meet this particular element of the claim. *See* 921 Application, Notice of Allowability (attached as Ex. 34 hereto) at 2-3. *See, e.g., In re*

*McDonald*, 43 F.4th 1340, 1347 (Fed. Cir. 2022) (claim amended to overcome 101 rejection by adding "processor" limitation cannot be broadened during reissue to recapture surrendered "no processor" subject matter); *Lighthouse Consulting Grp., LLC v. BB&T Corp.,* 476 F. Supp. 3d 532, 543-44 (W.D. Tex. 2020) (granting motion to dismiss and finding claim term "carrier" in a check processing patent construed to be limited to "physical object" (e.g., sheet of paper to which the check is attached) cannot be expanded to capture mobile banking application software).

142.    The 584 Accused System and Kubernetes do not infringe the 584 Patent because Kubernetes, among other things, does not meet the "at least one hardware processor" limitation. For example, the Kubernetes's documentation explains that is a software program—specifically, an open-source container orchestration platform for automating deployment, scaling, and management of containerized applications (e.g., software). *See* https://kubernetes.io/docs/concepts/overview/ ("Kubernetes is a portable, extensible, open source platform for managing containerized workloads and services.")

143.    Documentation states that Kubernetes normally runs in a virtualized environment (e.g., virtualized processors), not on bare metal (e.g., physical processors). *See, e.g.,* https://medium.com/@zemim/guide-to-bare-metal-kubernetes-everything-you-need-to-know-e15aedf013a3 ("When setting up your deployment, you'll need to choose between bare metal and VM- (virtual machine) based Kubernetes"). According to documentation, bare metals Kubernetes is the exception, and not the norm. *See* https://www.spectrocloud.com/blog/introducing-bare-metal-kubernetes-what-you-need-to-know ("Bare metal Kubernetes means deploying Kubernetes clusters and their containers directly on physical servers, instead of inside traditional virtual machines (VMs) managed by a hypervisor layer."). No bare metal Kubernetes exists at Travelers, so the "at least one hardware processor" limitation of Claim 1 of the 584 Patent is not met.

144.    At least because of the absence of "at least one hardware processor" as discussed above, Travelers does not directly infringe the 584 Patent, either literally or under the doctrine of equivalents.

145.    Likewise, at least because there is no direct infringement, Travelers does not indirectly infringe the 584 Patent, including no induced or contributory infringement of the 584 Patent.

146.    Absent a declaration of non-infringement, IV will continue to wrongfully allege that Travelers infringes the 584 Patent, and thereby cause Travelers irreparable injury and damage.

147.    For at least these reasons, an actual, justiciable, substantial, immediate, and continuing controversy exists between Travelers and IV regarding whether Travelers infringes or has infringed the 584 Patent.

148.    Travelers therefore seeks a judicial declaration under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., finding that Travelers (including through its alleged use of the 584 Accused System and Kubernetes) does not infringe the 584 Patent.

**COUNT VII**
**DECLARATION OF NON-INFRINGEMENT OF THE 762 PATENT**

149.    Travelers incorporates by reference paragraphs 1-50 as if fully set forth herein.

150.    The 762 Patent is titled "Storing Lossy Hashes of File Names and Parent Handles Rather Than Full Names Using a Compact Table for Network-Attached-Storage (NAS)." The 762 Patent's Abstract states:

> Multiple Network Attached Storage (NAS) appliances are pooled together by a virtual NAS translator, forming one common name space visible to clients. Clients send messages to the virtual NAS translator with a file name and a virtual handle of the parent directory that are concatenated to a full file-path name and compressed by a cryptographic hash function to generate a hashed-name key. The hashed-name key is matched to a storage key in a table. The full file-path name is not stored, reducing the table size. A unique entry number is returned to the client as the virtual

55

file handle that is also stored in another table with one or more native file handles, allowing virtual handles to be translated to native handles that the NAS appliance servers use to retrieve files. File movement among NAS servers alters native file handles but not virtual handles, hiding NAS details from clients.

151.   IV has asserted that third-party software called MongoDB that IV alleges Travelers is using (the "762 Accused System") infringes the 762 Patent. In particular, IV asserts that Travelers "makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import" the 762 Accused System in a manner that infringes Claim 7 of the 762 Patent. *See, e.g.*, Exs. 17, 18. IV has not provided further details on the 762 Accused System's or MongoDB's alleged infringement of the 762 Patent.

152.   Contrary to IV's assertions, Travelers has not infringed and does not infringe, under any theory of infringement (including directly (whether individually or jointly), indirectly (whether contributorily or by inducement), and/or under the doctrine of equivalents), any claim of the 762 Patent, including through any making, use, offering to sell, selling, and/or importing of the 762 Accused System or MongoDB, at least because the 762 Accused System and MongoDB do not employ, incorporate, use, or otherwise include all of the limitations of the 762 Patent's claims.

153.   Although there are additional reasons why Travelers, the 762 Accused System, and MongoDB do not infringe the 762 Patent, non-limiting examples are discussed below.

154.   IV has only identified independent Claim 7 of the 762 Patent as asserted. Claim 7 recites:

7. A method for accessing files, comprising:

receiving from *a file system apparatus*, via a network, by *a storage apparatus*, a translated file-access request of *a client device*,

wherein the *translated file-access request* includes a *native file handle* determined based on *a virtual file handle* having *a client unique identifier* and included in a file-access request of the client device,

wherein a file-opening request including a file name and parent-directory virtual file handle have been combined into a combination name prior to the

translated file-access request being received by the storage apparatus for use in generating and *providing the client unique identifier to the client device* for inclusion in the virtual file handle of the file access request;

accessing a selected file stored on the storage apparatus, by the storage apparatus, using the native file handle; and

sending the accessed file back to the client device, via the network, by the storage apparatus.

155.    With respect to Claim 7's limitation of "receiving from a *file system apparatus*, via a network, by a *storage apparatus*, a *translated file-access request* of a client device," the 762 Patent Specification equates a file system apparatus to an intermediary translator (the NAS translator) that sits between the client device or application and the claimed storage apparatus. *See, e.g.,* 762 Patent 3:42-50 ("Virtual NAS translator 30 receives the NFS request from clients, and performs name translation from virtual names and file handles on front network 34 to native names and file handles on back network *36*."); *see also* Fig. 4.



FIG. 4

57

156.    Documentation indicates that MongoDB comes in two configurations, a non-sharded (otherwise known as a single-server) configuration and a sharded configuration with multiple servers or shards. Documentation states that non-sharded MongoDB uses a single database instance or a replica set where all data resides on one server. *See* https://www.mongodb.com/docs/manual/replication/ (A non-sharded configuration in MongoDB uses "a group of mongod processes that maintain the same data set" called a replica set, where "replica sets provide redundancy and high availability, and are the basis for all production deployments."); *see also* https://www.mongodb.com/docs/manual/faq/sharding/ ("if your data set fits on a single server, you should begin with an unsharded deployment as sharding while your data set is small provides little advantage."). In contrast, "[s]harding in MongoDB is the process of horizontally splitting data across multiple servers/nodes." *See* https://www.mongodb.com/resources/products/capabilities/sharding ("MongoDB supports horizontal scaling through its sharding architecture, which distributes data and workloads across multiple servers (shards).")



58

*See* https://medium.com/@parvjn616/demystifying-mongodb-sharding-255983d376e1 (showing non-sharded (single-server) MongoDB configuration on left with no intermediary interface between replica set and the client/application and sharded Mongo on the right with intermediary Mongo Routers); *see also* https://www.mongodb.com/docs/manual/core/sharded-cluster-components/ ("The mongos acts as a query router, providing an interface between client applications and the sharded cluster.")

157.   MongoDB in its non-sharded configuration does not infringe Claim 7 of the 762 Patent because, among other things, it does not meet the limitation of "receiving from *a file system apparatus*, via a network, by *a storage apparatus*, a translated file-access request of *a client device*," where the file system apparatus, storage apparatus and client device are distinct and separate components, and particularly where the file system apparatus (the 762 Patent's NAS translator) serves as an intermediary interface between the client and the storage apparatus. Non-sharded MongoDB at least lacks the claimed file system apparatus, or the intermediary interface, that intercepts the client's request, as illustrated below.



| 762 Patent, Fig. 4 (showing file system VNAS 30 as intermediary interface between application layer (client) and the NAS appliance/servers 21 and 21') | Documentation figure showing no intermediary interface in non-sharded MongoDB. *See, e.g.,* https://medium.com/@parvjn616/demystifying-mongodb-sharding-255983d376e1. |



*See* https://www.mongodb.com/docs/manual/replication/ (showing MongoDB client read/write requests sent without any intermediary interface).

158.    MongoDB in its sharded configuration also does not infringe Claim 7 of the 762 Patent because, among other things, it does not meet the limitation of "wherein the translated file-access request includes *a native file handle* determined based on *a virtual file handle* having *a client unique identifier* and included in a file-access request of the client device."

159.    The 762 Patent's specification describes the native file handle, the virtual file handle, and the client unique identifier of Claim 7 as three distinct identifiers involved in the translated file-access request. *See, e.g.*, 762 Patent 3:60-64 ("Virtual NAS translator 30 receives

60

the NFS request from clients, and performs name translation from virtual names and file handles on front network 34 to native names and file handles on back network 36.") 3:61-62 (virtual file = file handle on front network); 3: 62-63 (native file handle = file handle on back network); 7:23-30 ("Unique ID is a value generated by the virtual NAS Translator that is unique for each entry [in translation table] ... Unique ID is returned to the client as part of the virtual NFS file handle.").

160.    Documentation explains MongoDB at least lacks the three distinct identifiers required by Claim 7 of the 762 Patent. *See, e.g.*, https://dev.to/mongodb/mongodb-indexing-internals-showrecordid-and-hintnatural1-4cpl ("MongoDB default collections are similar to heap tables because their documents are stored independently of the primary key ("_id") exposed to the application [i.e., client]. Internally, the WiredTiger storage engine organizes collection documents using a B+Tree structure, with an internal RecordId as the key, assigned by MongoDB."); *see also* https://www.mongodb.com/docs/manual/reference/glossary/ (_id and ObjectID are used interchangeably) ("A field required in every MongoDB document... The _id field must have a unique value. You can think of the _id field as the document's primary key. If you create a new document without an _id field, MongoDB automatically creates the filed and assigns a unique BSON ObjectID to the filed.")

161.    In addition, MongoDB in both the non-sharded and sharded configurations does not meet the limitation of "wherein a file-opening request including a file name and parent-directory virtual file handle have been combined into a combination name prior to the translated file-access request being received by the storage apparatus for use in generating and ***providing the client unique identifier to the client device*** for inclusion in the virtual file handle of the file access request," because no identifier in MongoDB is generated in this manner, as required by Claim 7.

61

162.     Specifically, the Unique ID in the 762 Patent is generated on the server-side and then later sent or "returned" to the client (i.e., located on non-server side). The 762 specification repeatedly confirms that the virtual NAS translator (located on server) generates the Unique ID which it then sends to the client. 7:23-25 ("Each entry 50 is also identified by a unique identifier. *Unique ID 49 is a value generated* by the *virtual NAS translator* that is unique for each entry.") 7:22-24 ("Unique ID 49 is *returned to the client* as part of the virtual NFS file handle."); *see also* Figs. 5 (showing Virtual NAS translator (VNAS 30) where the Unique ID is generated relative to client) and Fig. 4 (showing NAS translator is on the server-side of network, away from the client or application layer (APPLN)):



FIG. 5



FIG. 4

163.     In MongoDB, however, documentation states that "[b]y default, MongoDB drivers generate ObjectId values on the client side." *See* https://www.mongodb.com/docs/manual/reference/method/ObjectId/



*See,    e.g.,,*    https://medium.com/double-pointer/how-mongodb-works-a-deep-dive-into-its-architecture-556af6b65059. Accordingly, MongoDB does not meet the claimed limitation of "wherein a file-opening request including a file name and parent-directory virtual file handle have been combined into a combination name prior to the translated file-access request being received by the storage apparatus for use in generating and ***providing the client unique identifier to the client device*** for inclusion in the virtual file handle of the file access request."

164.    At least because of the absence of the "receiving from ***a file system apparatus***, via a network, by ***a storage apparatus***, a translated file-access request of ***a client device***," "wherein the translated file-access request includes ***a native file handle*** determined based on ***a virtual file handle*** having ***a client unique identifier*** and included in a file-access request of the client device," and "wherein a file-opening request including a file name and parent-directory virtual file handle have been combined into a combination name prior to the translated file-access request being received by the storage apparatus for use in generating and ***providing the client unique identifier to the client device*** for inclusion in the virtual file handle of the file access request" as discussed

above, Travelers does not directly infringe the 762 Patent, either literally or under the doctrine of equivalents.

165.    Likewise, at least because there is no direct infringement, Travelers does not indirectly infringe the 762 Patent, including no induced or contributory infringement of the 762 Patent.

166.    Absent a declaration of non-infringement, IV will continue to wrongfully allege that Travelers infringes the 762 Patent, and thereby cause Travelers irreparable injury and damage.

167.    For at least these reasons, an actual, justiciable, substantial, immediate, and continuing controversy exists between Travelers and IV regarding whether Travelers infringes or has infringed the 762 Patent.

168.    Travelers therefore seeks a judicial declaration under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, finding that Travelers (including through its alleged use of the 762 Accused System and MongoDB) does not infringe the 762 Patent.

## COUNT VIII
## DECLARATION OF NON-INFRINGEMENT OF THE 287 PATENT

169.    Travelers incorporates by reference paragraphs 1-50 as if fully set forth herein.

170.    The 287 Patent is titled "Systems and Methods for Compound Searching." The 287 Patent's Abstract states:

> A search service includes a network-connected server, a data repository coupled to the first server, and software resident in the data repository and executing on the first server. The service, through the software, presents an interactive interface to a user, determines, through iterative interaction with the user a purpose for a search, develops search criteria for the search, enters the criteria to one or more standard search engines accessible through the network, and collects results of the search on behalf of the user.

171.    IV has asserted that third-party software called Elasticsearch that IV alleges Travelers is using (the "287 Accused System") infringes one or more claims of the 287 Patent. In

65

particular, IV asserts that Travelers "makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import" the 287 Accused System in a manner that infringes the 287 Patent. *See* Ex. 17 at 1. IV has not provided further details on the 287 Accused System's or Elasticsearch's alleged infringement of the 287 Patent.

172.    Contrary to IV's assertions, Travelers has not infringed and does not infringe, under any theory of infringement (including directly (whether individually or jointly), indirectly (whether contributorily or by inducement), and/or under the doctrine of equivalents), any claim of the 287 Patent, including through any making, use, offering to sell, selling, and/or importing of the 287 Accused System or Elasticsearch, at least because the 287 Accused System and Elasticsearch do not employ, incorporate, or otherwise make use of all of the limitations of the 287 Patent's claims.

173.    Although there are additional reasons why Travelers, the 287 Accused System and Elasticsearch do not infringe any claim of the 287 Patent, several non-limiting examples are discussed below.

174.    IV has only identified independent claim 28 of the 287 Patent as asserted. Claim 28 recites:

28. A system, comprising:

a network interface configured to connect to a network-coupled server that provides a search service

*display hardware configured to present an interactive interface that is supplied by the search service*,

*wherein the interactive interface is configured to iteratively collect input* including at least one term related to a description of a search *to refine a purpose for the search and further configured to request and receive at least one first clarification related to the at least one term, and to send the at least one first clarification to the search service*

*and further configured to, in response to receiving the first clarification, request and receive at least one second clarification related to the at least one term, and to send the second clarification to the search service*.

175. With respect to Claim 28's limitation of "display hardware configured to present an interactive interface that is supplied by the search service," the 287 Patent Specification describes the claimed system as client-side hardware (mobile appliance, laptop, or desktop computer) that receives and displays a full conversational, iterative interface supplied by the remote search service. *See, e.g.,* 287 Patent 7:13-45 ("In an embodiment of the present invention a user is directed to describe to the service the nature of the information desired, in more detail than in conventional search services, and in context… The interface will typically be a text entry window, but may be voice enabled in some embodiments, and there may be multiple choice questions to be answered."); *see also id.* at 7:9-12 ("Typically, in a standard search engine interactive page, there is a single entry window…" contrasting the claimed multi-step dialog). The specification's example shows the service itself supplying Yes/No clarification questions on the client display hardware after the user enters a paragraph description (e.g., "We determine the main focus is Abraham Lincoln" Yes/No; "A secondary focus is his assassination" Yes/No, followed by a further clarification question).

176. The 287 Accused System and Elasticsearch do not infringe the 287 Patent at least because they lack a "display hardware configured to present an interactive interface that is supplied by the search service." Documentation indicates that Elasticsearch is accessed via software HTTP REST APIs for one-shot queries and returns results; Elasticsearch does not supply or include any display hardware or user-facing interactive interface. *See, e.g.,* https://www.elastic.co/docs/reference/elasticsearch/rest-apis (Elasticsearch core functionality is the RESTful search API); https://www.elastic.co/search-labs/blog/elasticsearch-autocomplete-search (any suggestion or autocomplete features are implemented through the search API, not as a supplied client interface). Documentation consistently describes Elasticsearch as server/cluster

software that clients or separate front-end applications connect to via software API calls. *See also* https://medium.com/@ramekris/enterprise-search-using-elasticsearch-19d35dacae15    (Fig.    1 showing Elasticsearch as backend only).



**Figure 1:** Enterprise Search using ElasticSearch for a SaaS Platform

177.    The 287 Accused System and Elasticsearch also do not infringe the 287 Patent because, among other things, Elasticsearch does not meet the limitations of "wherein the interactive interface is configured to iteratively collect input… to refine a purpose for the search," "and further configured to request and receive at least one first clarification related to the at least one term, and to send the at least one first clarification to the search service," and "and further configured to, in response to receiving the first clarification, request and receive at least one second clarification related to the at least one term, and to send the second clarification to the search service," where the search service supplies the specific multi-turn clarification dialog described in the specification. Documentation states that Elasticsearch provides REST API responses to direct

queries submitted by clients; Elasticsearch does not supply or drive the claimed iterative clarification loop on client display hardware, via first or second clarifications, or otherwise.

178.    The 287 Accused System and Elasticsearch also do not meet the limitations of Claim 28 because they do not function as an intermediary "search service" that, after refining purpose via the claimed interface, "develops search criteria" and "enters the criteria to one or more standard search engines" accessible through the network, as described in the 287 Patent Abstract and Specification at steps 404-406 of Figure 4 below. Elasticsearch does not sit upstream of other search engines such as Google or Yahoo in the manner required by the patent.



Fig. 4

179.    At least because of the absence of "display hardware configured to present an interactive interface that is supplied by the search service," "wherein the interactive interface is

configured to iteratively collect input… to refine a purpose for the search," "and further configured to request and receive at least one first clarification related to the at least one term, and to send the at least one first clarification to the search service," and "and further configured to, in response to receiving the first clarification, request and receive at least one second clarification related to the at least one term, and to send the second clarification to the search service" as discussed above, Travelers does not directly infringe the 287 Patent, either literally or under the doctrine of equivalents.

180.    Likewise, at least because there is no direct infringement, Travelers does not indirectly infringe the 287 Patent, including no induced or contributory infringement of the 287 Patent.

181.    Absent a declaration of non-infringement, IV will continue to wrongfully allege that Travelers infringes the 287 Patent, and thereby cause Travelers irreparable injury and damage.

182.    For at least these reasons, an actual, justiciable, substantial, immediate, and continuing controversy exists between Travelers and IV regarding whether Travelers infringes or has infringed the 287 Patent.

183.    Travelers therefore seeks a judicial declaration under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, finding that Travelers (including through its alleged use of the 287 Accused System and Elasticsearch) does not infringe the 287 Patent.

**COUNT IX**
**DECLARATION OF NON-INFRINGEMENT OF THE 081 PATENT**

184.    Travelers incorporates by reference paragraphs 1-50 as if fully set forth herein.

185.    The 081 Patent is titled "Systems and Methods for Scheduling, Processing, and Monitoring Tasks." The 081 Patent's Abstract states:

70

A computer-implemented method for performing a process is provided. The method comprises: (a) receiving a request to perform a process, the process comprising a plurality of tasks and at least a scheduler rule; (b) receiving a plurality of checkpoints associated with the process, each checkpoint comprising checkpoint state data and at least a respective checkpoint rule governing execution of the process; (c) determining a first task of the plurality of tasks to be scheduled into a priority queue, in accordance with the scheduler rule; (d) determining the first checkpoint of the plurality of checkpoints that is to be the first checkpoint used in processing the first task, in accordance with the scheduler rule; (e) creating the checkpoint state data for the first checkpoint; (f) saving the checkpoint state data for the first checkpoint; (g) processing the first task in accordance with the checkpoint rule associated with the first checkpoint; (h) determining the next task in the plurality of tasks to perform, based on the checkpoint rule associated with the first checkpoint; (i) updating the saved checkpoint data for the first checkpoint with the data and state associated with the first task; and (j) repeating steps (c) through (i) for each subsequent task and checkpoint, in accordance with the respective scheduler and checkpoint rules, until a predetermined condition has been reached.

186.    IV has asserted that third-party software called Spark that IV alleges Travelers is using (the "081 Accused System") infringes the 081 Patent. In particular, IV asserts that Travelers "makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import" the 081 Accused System in a manner that infringes Claim 1 of the 081 Patent. *See* Ex. 17, 18. IV has not provided further details on the 081 Accused System's or Spark's alleged infringement of the 081 Patent.

187.    Contrary to IV's assertions, Travelers has not infringed and does not infringe, under any theory of infringement (including directly (whether individually or jointly), indirectly (whether contributorily or by inducement), and/or under the doctrine of equivalents), any claim of the 081 Patent, including through any making, use, offering to sell, selling, and/or importing of the 081 Accused System or Spark, at least because the 081 Accused System and Spark do not employ, incorporate, use, or otherwise include all of the limitations of the 081 Patent's claims.

188.    Although there are additional reasons why Travelers, the 081 Accused System, and Spark do not infringe the 081 Patent, non-limiting examples are discussed below.

71

189.    IV has only identified independent Claim 1 of the 081 Patent as asserted. Claim 1 recites:

1. A computer-implemented method for performing a process, the method comprising:

(a) receiving a request to perform a process, the process having a state and comprising a plurality of tasks and at least a scheduler rule;

(b) receiving a plurality of checkpoints associated with the process, *each checkpoint comprising* checkpoint state data and *at least a respective checkpoint rule governing execution of the process*, wherein the checkpoint state data comprises information about the state of the process and *wherein the checkpoint rule defines*, based at least in part on at least one of the checkpoint state data and a first predetermined condition, *one or more of the plurality of tasks to be executed and the way in which the one or more tasks will execute*;

(c) determining a first task of the plurality of tasks to be scheduled into a priority queue, in accordance with the scheduler rule;

(d) determining the first checkpoint of the plurality of checkpoints that is to be the first checkpoint used in processing the first task, in accordance with the scheduler rule;

(e) creating the checkpoint state data for the first checkpoint; and

(f) saving the checkpoint state data for the first checkpoint.

190.    With respect to Claim 1's limitation "each checkpoint comprising state data *and at least a respective checkpoint rule* governing execution of the process ... [that] defines ... one or more of the plurality of tasks to be executed and the way in which the one or more tasks will execute," the 081 specification states "each process can be divided into checkpoints 136 (e.g., checkpoints 136A, 136B, and 136D of FIG. 3)" and "*[e]ach checkpoint 136 effectively has 'intelligence' because the checkpoint includes and is associated with one or more rules that tell how the checkpoint 136 is to proceed*." *See, e.g.*, 081 Patent 12:18-22. The "rule[s (e.g., 'developer-provided rules' or 'strategy patterns')] encapsulate[] the decision making necessary for selecting the next processor function." *Id.* 4:16-20.

191.    The 081 Accused System and Spark do not infringe the 081 Patent at least because they lack a checkpoint comprising a "checkpoint rule governing execution of the process ... [that] defines ... one or more of the plurality of tasks to be executed and the way in which the one or more tasks will execute." Spark documentation states that "RDD.checkpoint()" will "[m]ark this RDD for checkpointing," so the RDD "will be saved to a file ... and all references to its parent RDDs      will      be      removed." *See* https://spark.apache.org/docs/latest/api/python/reference/api/pyspark.RDD.checkpoint.html. "Resilient distributed dataset" (RDD) checkpoints do not contain instructions or rules governing execution of a process that define one or more of the plurality of tasks to be executed and the way in which the one or more tasks will execute. *See, e.g.*, *id.* For example, the documentation below describes checkpointing the RDD "nums" and recovering that checkpoint to "numsRecovered:"

```
import org.apache.spark.sql.functions.rand
val nums = spark.range(5).withColumn("random",
rand()).filter($"random" > 0.5)
scala> nums.show
+---+------------------+
| id|            random|
+---+------------------+
|  0| 0.752877642067488|
|  1|0.5271005540026181|
+---+------------------+

...

// Set org.apache.spark.rdd.ReliableRDDCheckpointData logger to INFO
// to see what happens while an RDD is checkpointed
// Let's use log4j API
import org.apache.log4j.{Level, Logger}
Logger.getLogger("org.apache.spark.rdd.ReliableRDDCheckpointData").
setLevel(Level.INFO)

scala> nums.checkpoint
18/03/23 00:05:15 INFO ReliableRDDCheckpointData: Done checkpointing
RDD 12 to file:/tmp/checkpoints/b1f413dc-3eaf-46a0-99de-
d795252035e0/rdd-12, new parent is RDD 13
res7: org.apache.spark.sql.Dataset[org.apache.spark.sql.Row] = [id:
bigint, random: double]

...
```

73

```
// Recover nums dataset from the checkpoint files
// Start from recovering the underlying RDD
// And create a Dataset based on the RDD

...

import org.apache.spark.sql.my2
val numsRecovered = my2.createDataFrame(spark, numsRddRecovered,
schema)
scala> numsRecovered.show
+---+------------------+
| id|            random|
+---+------------------+
|  0| 0.752877642067488|
|  1|0.5271005540026181|
+---+------------------+
```

*See* https://books.japila.pl/spark-sql-internals/checkpointing/.

192. At least because of the absence of a checkpoint comprising a "checkpoint rule governing execution of the process ... [that] defines ... one or more of the plurality of tasks to be executed and the way in which the one or more tasks will execute" as discussed above, Travelers does not directly infringe the 081 Patent, either literally or under the doctrine of equivalents.

193. Likewise, at least because there is no direct infringement, Travelers does not indirectly infringe the 081 Patent, including no induced or contributory infringement of the 081 Patent.

194. Absent a declaration of non-infringement, IV will continue to wrongfully allege that Travelers infringes the 081 Patent and thereby cause Travelers irreparable injury and damage.

195. For at least these reasons, an actual, justiciable, substantial, immediate, and continuing controversy exists between Travelers and IV regarding whether Travelers infringes or has infringed the 081 Patent.

196. Travelers therefore seeks a judicial declaration under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, finding that Travelers (including through its alleged use of the 081 Accused System and Spark) does not infringe the 081 Patent.

## COUNT X
## DECLARATION OF NON-INFRINGEMENT OF THE 894 PATENT

197.    Travelers incorporates by reference paragraphs 1-50 as if fully set forth herein.

198.    The 894 Patent is titled "Disaggregated Resources and Access Methods." The 894

Patent's Abstract states:

> Disaggregated resources distributed among resource nodes provide access to
> resource consumers by offering resource node information to the resource
> consumers. Resource node information supplied by each individual resource node
> comprises incomplete information with respect to the complete disaggregated
> resource. Resource consumers collect resource node information to create maps of
> the disaggregated resource, ensure coherency, or manage the disaggregated
> resource.

199.    IV has asserted that third-party software called Kafka that IV alleges Travelers is

using (the "894 Accused System") infringes the 894 Patent. In particular, IV asserts that Travelers

"makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make,

use, sell, offer to sell and/or import" the 894 Accused System in a manner that infringes Claim 15

of the 894 Patent. *See* Ex. 17, 18. IV has not provided further details on the 894 Accused System's

or Kafka's alleged infringement of the 894 Patent, but IV has asserted another patent, the 722

Patent (discussed *supra* in Count III) against third-party software called Kafka. *See, e.g.*, IV's 722

Patent infringement contentions in *IV v. American Airlines* (Ex. 24).

200.    Contrary to IV's assertions, Travelers has not infringed and does not infringe, under

any theory of infringement (including directly (whether individually or jointly), indirectly

(whether contributorily or by inducement), and/or under the doctrine of equivalents), any claim of

the 894 Patent, including through any making, use, offering to sell, selling, and/or importing of the

894 Accused System or Kafka, at least because the 894 Accused System and Kafka do not employ,

incorporate, use, or otherwise include all of the limitations of the 894 Patent's claims.

75

201. Although there are additional reasons why Travelers, the 894 Accused System, and Kafka do not infringe the 894 Patent, non-limiting examples are discussed below.

202. IV has only identified dependent Claim 15 of the 894 Patent as asserted. Claim 15 depends from independent Claim 8. Claims 8 and 15 respectively recite:

8. A method, comprising:

receiving, at a resource consumer device, node names corresponding to each of a plurality of resource nodes;

***determining, using the resource consumer device, an organizational structure of the plurality of resource nodes based on the received node names***, the organizational structure being a parallel structure that enables access to a data set through at least two of the plurality of resource nodes or a serial structure that enables access to a first data block of the data set through a first resource node and to a second data block consecutive to the first data block of the data set through a second resource node; and

generating, using the resource consumer device, a resource map based at least in part on the organizational structure; and

messaging, by the resource consumer device, one or more resource nodes of the plurality of resource nodes about the data set based at least in part on the resource map.

15. The method of claim 8, wherein the received node names are configured to indicate a group type associated with the plurality of resource nodes.

203. The 894 Patent states in the "Summary of the Invention" that "[t]he present invention is directed toward disaggregated resources that are spread among a number of resource nodes. The resource nodes provide information about the nodes to resource consumers who then create maps of the resource in order to properly access the resource. The resource node information from ***a single resource node comprises insufficient information*** for a useable map of the disaggregated resource. Resource node information from multiple resource nodes allows for the creation of a more complete, useable map from perspective of a resource consumer." 894 Patent 4:28-37.

204.    The "Summary of the Invention" also states that "[a]nother aspect of the invention is directed toward methods for accessing the disaggregated resource through organizing resource nodes into the disaggregated resource, assigning resource node information, and assessing if the disaggregated resource has coherency. The resource nodes respond to discovery messages by providing their resource node information from which the resource consumers construct a map on how to access the resource." *Id.* 4:43-47.

205.    The 894 Patent provides a "glossary" with, among others, the following definitions:

"Resource Node" means a logical construct executing on a processor comprising software or firmware that provides a representation of a resource partition

"Resource" means a fungible commodity required or desired by a resource consumer for the consumer's operation. ...

Resources have granularity; therefore, "resource partition" means a logical representation of a portion of a physical resource. For example, a resource partition of a hard disk drive includes a logical partition on the disk that is addressable external to the disk. Another example of a resource partition includes a range of pixels in an (x,y) coordinate system on a video display representing a logical frame that is addressable external to the display.

Further granularity is possible; therefore, "resource element" means a natural, logical unit of the resource that can be addressed. An example of a resource element for a storage system based on a hard disk drive includes a data block on the disk. Yet another example of a resource element includes a pixel of a video display. ...

An example of a resource node is a combination of hardware, software, or firmware that functions as a logical partition of a disk. The logical disk partition accepts read or write requests based on a logical block address (LBA) of a data block, and then performs the requested operation on the disk. Yet another example includes a combination of hardware, software, or firmware that functions as a logical video frame.

*Id.* 5:57, 6:1-24, 6:53-55 (formatting adjusted).

206.    Fig. 1 of the 894 Patent "presents a schematic for a disaggregated resource comprising more than one resource nodes" and Fig. 2 "presents a schematic for a possible embodiment of a resource node." *Id.* 8:6-7, 8:45-46.



Figure 1

Figure 2

207.    The 894 Patent explains that "each individual resource node *lacks information about the complete disaggregated resource*. Resource consumers obtain resource node information from each of the individual resource nodes and combine the information to form a description of the disaggregated resource in order to properly interact with it." *Id.* 11:32-38. The 894 Patent gives an example of a "disaggregated storage array comprising a number of resource nodes where the resource nodes are logical disk partitions," which is an example the patent specifically states "is provided to clarify how resource consumers can utilize resource node names" because "[t]he resource consumer attempts to make sense of the [resource node] structure through each resource node's name." *Id.* 13:45-49, 13:66-67. "Table 1 [below] lists a possible name associated with the eight nodes composing logical volume 500. Table 1 assumes logical volume 500 has name 'Z' and that mirror groups are designated by the letter 'M' and a number. In addition,

stripe groups are designated by the letter 'R' and a number. 'R' is used in the example to reflect stripes are a RAID 0 group. Span groups are designated by the letter 'S.'" *Id.* 14:7-14.

| TABLE 1 | |
| --- | --- |
| Resource Node Names for Example Storage Structure Logical Volume 500 in FIG. 5B | |
| Resource Node | Example Name |
| Root Node 510 | Z |
| Resource Node 522 | Z.M1 |
| Resource Node 524 | Z.M1.R1 |
| Resource Node 526 | Z.M1.R2 |
| Resource Node 532 | Z.M2 |
| Resource Node 534 | Z.M2.R1 |
| Resource Node 537 | Z.M2.R2 |
| Resource Node 539 | Z.M2.R2.S1 |

"Resource node names form two different classes: those that provide resource node role information and those that do not. Resource node role information helps resource consumers determine how to properly interact with individual resource nodes. For example in the case of a mirror group 520, resource nodes 522, 524, and 526 are striped nodes. ... Through structured naming, resource consumers determine the overall structure of a disaggregated resource and identify gaps in the structure. For example, if resource node 524 does not respond to a discovery request by a resource consumer, the resource consumer understands there is a gap between resource node 522 with name "Z.M1" and resource node 526 with name "Z.M1.R2." Therefore, the resource consumer has sufficient information to determine that mirror group 520 (as serial group of striped resource nodes) is incomplete and can not be used." *Id*. 14:30-37, 14:62-15:4.

208.    Documentation illustrates Kafka's architecture as follows:



*See* https://github.com/AutoMQ/automq/wiki/Kafka-Architecture:-Concept-&-Components. "A Kafka broker is a server that receives messages from producers, assigns offsets, and writes them to disk storage. It also services consumers by responding to fetch requests for partitions. ... Producers are client applications that publish data to Kafka topics. ... A topic is a logical grouping of events stored as an ordered sequence of messages (event log). Multiple applications can write to and read from the same topic. ... Topics are divided into partitions, which are append-only, ordered log files. ... A single broker acts as the leader for a partition, while others are followers. ... Consumers are applications that subscribe to topics and read messages in the order they were produced for each partition." *Id.* (emphasis removed).

209.    The 894 Accused System and Kafka do not infringe the 894 Patent at least because they do not "determin[e], using the resource consumer device, an organizational structure of the plurality of resource nodes based on the received node names." Kafka documentation explains:

How can the client find out which topics exist, what partitions they have, and which brokers currently host those partitions so that it can direct its requests to the right hosts? This information is dynamic, so you can't just configure each client with some static mapping file. Instead all Kafka brokers can answer a metadata request

that describes the current state of the cluster: what topics there are, which partitions those topics have, which broker is the leader for those partitions, and the host and port information for these brokers. ...

The client does not need to keep polling to see if the cluster has changed; it can fetch metadata once when it is instantiated cache that metadata until it receives an error indicating that the metadata is out of date.

*See* https://kafka.apache.org/42/design/protocol/.

210.    Documentation for Kafka also illustrates Kafka's "two-phase discovery mechanism," which does not involve a resource consumer device determining an organizational structure of the resource nodes based on the received node names:

Kafka uses a two-phase discovery mechanism that distinguishes it from simpler client-server architectures:

1. **Bootstrap Phase**: Initial connection using bootstrap servers
2. **Metadata Discovery Phase**: Learning the full cluster topology ...



...

**Phase 1: Bootstrap Connection**
**What Are Bootstrap Servers?**
Bootstrap servers are the initial contact points for Kafka clients. They're specified in the client configuration ...

**Bootstrap Connection Process**
1. Client attempts to connect to the first bootstrap server
2. If connection fails, tries the next server in the list
3. Continues until successful connection or all servers are exhausted

81

4. Only ONE successful connection is needed

**Important**: You don't need to list all brokers as bootstrap servers. A single reachable broker is sufficient, though multiple are recommended for redundancy.

...

**Phase 2: Metadata Discovery**
After the bootstrap connection succeeds, the client learns the full cluster topology:

Broker Addresses in Metadata:
The metadata response contains advertised.listeners addresses for each broker. These are NOT necessarily the same as bootstrap server addresses

*See* https://blog.vitalvas.com/post/2025/10/08/how-kafka-bootstrap-connection-works/.

211.    At least because of the absence of "determining, using the resource consumer device, an organizational structure of the plurality of resource nodes based on the received node names" as discussed above, Travelers does not directly infringe the 894 Patent, either literally or under the doctrine of equivalents.

212.    Likewise, at least because there is no direct infringement, Travelers does not indirectly infringe the 894 Patent, including no induced or contributory infringement of the 894 Patent.

213.    Absent a declaration of non-infringement, IV will continue to wrongfully allege that Travelers infringes the 894 Patent, and thereby cause Travelers irreparable injury and damage.

214.    For at least these reasons, an actual, justiciable, substantial, immediate, and continuing controversy exists between Travelers and IV regarding whether Travelers infringes or has infringed the 894 Patent.

215.    Travelers therefore seeks a judicial declaration under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., finding that Travelers (including through its alleged use of the 894 Accused System and Kafka) does not infringe the 894 Patent.

**COUNT XI**
**DECLARATION OF NON-INFRINGEMENT OF THE 183 PATENT**

216.    Travelers incorporates by reference paragraphs 1-50 as if fully set forth herein.

217.    The 183 Patent is titled "Digital Object Routing Based on Service Request." The 183 Patent's Abstract states:

> A digital object may be routed via a network. Routing of a digital object may be based in part on a requested service, and/or on an ability of an intermediate node to provide the requested service, and/or on a willingness of an intermediate node to provide the requested service.

218.    IV has asserted that third-party software called Airflow that IV alleges Travelers is using (the "183 Accused System") infringes the 183 Patent. In particular, IV asserts that Travelers "makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import" the 183 Accused System in a manner that infringes Claim 1 of the 183 Patent. *See* Ex. 18.

219.    IV has not provided further details on the 183 Accused System's or Airflow's alleged infringement of the 183 Patent, but IV has asserted another patent, the 080 Patent, against third-party software called Spark, which integrates with Airflow. *See, e.g.*, https://pypi.org/project/apache-airflow-providers-apache-spark/ (Apache Airflow provides official integration with Apache Spark through the apache-airflow-providers-apache-spark provider package) (Spark together with Airflow, also part of the "183 Accused System" hereinafter). *See, e.g.*, IV's 080 Patent infringement contentions in *IV v. American Airlines* (Ex. 26).

220.    Contrary to IV's assertions, Travelers has not infringed and does not infringe, under any theory of infringement (including directly (whether individually or jointly), indirectly (whether contributorily or by inducement), and/or under the doctrine of equivalents), any claim of

the 183 Patent, including through any making, use, offering to sell, selling, and/or importing of the 183 Accused System, Airflow, or Spark, at least because the 183 Accused System, Airflow, and Spark do not employ, incorporate, use, or otherwise include all of the limitations of the 183 Patent's claims. IV's infringement contentions for the 080 Patent (Ex. 26) vs. Spark also fail to show any infringement by the 183 Accused System, Spark or Airflow.

221.    Although there are additional reasons why Travelers, the 183 Accused System, Airflow, and Spark do not infringe the 183 Patent, non-limiting examples are discussed below.

222.    IV has only identified independent Claim 1 of the 183 Patent as asserted. Claim 1 recites:

1. A method, comprising:

receiving a digital transmission form from a source node, wherein said receiving is performed by a network device within a network, wherein the digital transmission form corresponds to a digital object to be forwarded from the source node to a destination node, wherein the digital transmission form is wholly separate from the digital object, wherein the digital transmission form specifies at least one requested service to be performed in transmitting the digital object from the network device to the destination node, and wherein the at least one requested service specifies information relating to a time of transmission of the digital object by the network device;

determining an availability of one or more nodes within the network to provide the at least one requested service, *wherein said determining is performed by the network device;*

*receiving, at the network device, at least one portion of the digital object from the source node; and*

*transmitting, from the network device, the at least one portion of the digital object over the network to the one or more nodes* based at least in part on the availability of the one or more nodes to provide the at least one requested service.

223.    Claim 1's "network device" within a network, shown as node 114 in Fig. 1 below, is an intermediary device (e.g., node 114) for receiving and forwarding a "digital object" between a "source node" 110 and a "destination node" 118 based on a "determin[ation]" the "network device" makes from a "digital transmission form" (DTF) that corresponds to the "digital object."

*See, e.g.*, 183 Patent 8:21-23 ("Nodes 114 may be referred to in general as intermediaries referring to intermediate locations, devices, and/ or paths between source node 110 and destination node 118"), 7:64-8:2 ("Network 100 may be ... used in the transmission of all or portions of a digital object from source node 110 to destination node 118").



FIG. 1

The "digital object" itself is "the payload to be transmitted on network 100, for example a movie file" and "a digital transmission file[/form] (DTF) may refer to information regarding the digital object, which may be referred to as digital object information" and in one embodiment is "metadata about the digital object, for example size, bid, charges, QoS. routing information, and/or the like." *Id.* 13:24-36. The "digital transmission form" (aka "digital transmission file," DTF, "digital object information") "may include one or more of a size of the object to be transmitted, a description of the contents and/or the payload of the digital object, a requested timeliness of transmittal and/or a time frame in which the digital object is requested to be transmitted, a quality of service (QoS) with which the object is requested to be transmitted, an amount of money that the sender is willing to pay for transmission of the digital object, payment information such as credit card information, bank account information, bartering and/or trade information, and or other financial payment

information such as PayPal® account information and/or Western Union® payment information, and/or a level of priority with which the digital object is to be transmitted." *Id.* 13:59-14:5.

224. Claim 1's "network device" examines the "digital transmission form" (DTF) to "determine how and/or when the digital object should be transmitted to one or more destination nodes 118." *Id.* 14:9-11. For example, the "network device" node 114 "may review the requested service and/or services in the digital object information [(DTF)] to determine whether such intermediary nodes 114 have the capability to provide the requested services, and/or whether such intermediary nodes 114 have a willingness to provide the requested services. Such capability and/or willingness may be based, at least in part, on traffic loading at a given intermediary node 114, available bandwidth at a given intermediary node 114, available quality of service at a given intermediary node 114, an amount of money that source node 114 is willing to pay for requested services, a time frame in which a given intermediary node 114 is capable of receiving and/or forwarding the digital object, an amount of storage capacity available at a given intermediary node 114, for example where intermediary node 114 may be requested to store the digital object for a predetermined period, and/or whether a given intermediary node 114 is capable of receiving the form of payment indicated in the digital object information, for example whether a payment by a given credit card is accepted, and/or the like." *Id.* 14:19-40.

225. The 183 Accused System, Airflow, and Spark, however, do not infringe Claim 1 of the 183 Patent at least because they have no intermediary "network device" that receives, evaluates, and determines where to forward a "digital object" (e.g., data payload itself) based on a "digital transmission form" (e.g., metadata about the digital object to be forwarded).

226. As to Airflow, the documentation explains "Apache Airflow® is an open-source platform for developing, scheduling, and monitoring batch-oriented workflows" comprised of

"tasks" that "are discrete units of work that are run on workers." *See* https://airflow.apache.org/docs/apache-airflow/stable/index.html. "Airflow *is not* a data streaming solution. Tasks do not move data from one to the other." *See* https://airflow.apache.org/docs/apache-airflow/1.10.6/index.html (emphasis original). Nothing in Airflow is an intermediary "network device" that receives, evaluates, and determines where to forward a "digital object" (e.g., data payload itself) based on a "digital transmission form" (e.g., metadata about the digital object to be forwarded). *See, e.g.,* https://airflow.apache.org/docs/apache-airflow/stable/index.html; https://airflow.apache.org/docs/apache-airflow/1.10.6/index.html.

227.    As to Spark, the documentation describes Spark's architecture as: a "driver program," a "cluster manager," and "executors." *See* https://spark.apache.org/docs/latest/cluster-overview.html. "Spark uses a Driver-Executor architecture where one central coordinator (the Driver) manages many distributed workers (Executors)." *See* https://www.sparkplayground.com/tutorials/spark-theory/spark-architecture. "The Driver (Master Node) ... [c]onverts your code to execution plan, schedules tasks, collects results." *Id.* "The Cluster Manager ... is an external service that allocates resources (CPU and memory) across the cluster and manages the lifecycle of Executors." *Id.* And "[t]he Executors (Worker Nodes) ... are distributed agents responsible for two things: Executing code and Storing data." *Id.* "The main abstraction Spark provides is a resilient distributed dataset (RDD), which is a collection of elements partitioned across the [worker] nodes of the cluster that can be operated on in parallel." *See* https://spark.apache.org/docs/latest/rdd-programming-guide.html. "There are two main ways to create an RDD in Spark: 1. Parallelizing a Collection Taking a local list in your driver program and distributing it to the cluster. 2. Loading External Data Reading from a file system like HDFS,

S3, or a local file." *See* https://www.sparkplayground.com/tutorials/spark-theory/rdds-in-spark. Nothing in Spark (e.g., the driver program (master node), the cluster manager, or the executor (worker nodes)) is an intermediary "network device" that receives, evaluates, and determines where to forward a "digital object" (e.g., data payload itself) based on a "digital transmission form" (e.g., metadata about the digital object to be forwarded). *See, e.g.*, https://spark.apache.org/docs/latest/cluster-overview.html;

https://www.sparkplayground.com/tutorials/spark-theory/spark-architecture;

https://spark.apache.org/docs/latest/rdd-programming-guide.html;

https://www.sparkplayground.com/tutorials/spark-theory/rdds-in-spark.

228.    At least because of the absence of the intermediary "network device" that receives, evaluates, and determines where to forward a "digital object" (e.g., data payload itself) based on a "digital transmission form" (e.g., metadata about the digital object to be forwarded) as discussed above, Travelers does not directly infringe the 183 Patent, either literally or under the doctrine of equivalents.

229.    Likewise, at least because there is no direct infringement, Travelers does not indirectly infringe the 183 Patent, including no induced or contributory infringement of the 183 Patent.

230.    Absent a declaration of non-infringement, IV will continue to wrongfully allege that Travelers infringes the 183 Patent, and thereby cause Travelers irreparable injury and damage.

231.    For at least these reasons, an actual, justiciable, substantial, immediate, and continuing controversy exists between Travelers and IV regarding whether Travelers infringes or has infringed the 183 Patent.

232.    Travelers therefore seeks a judicial declaration under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, finding that Travelers (including through its alleged use of the 183 Accused System, Airflow, and Spark) does not infringe the 183 Patent.

## COUNT XII
## DECLARATION OF NON-INFRINGEMENT OF THE 124 PATENT

233.    Travelers incorporates by reference paragraphs 1-50 as if fully set forth herein.

234.    The 124 Patent is titled "Load Balancing with Shared Data." The 124 Patent's Abstract states:

> The method and system of the present invention provides an improved technique for integrated asset management. Information is aggregated from a variety of sources into a centralized computerized database. Thereafter, asset transition events are scheduled. Information from the centralized computerized database is used in the performance of the asset transition events and information relating to the asset transition events is added to the centralized computerized database. Subsequent changes to the asset are also recorded into the centralized computerized database. As a result, a plethora of information is available within said database for the purpose of a managing future asset transition events.

235.    IV has asserted that third-party software called Kubernetes that IV alleges Travelers is using (the "124 Accused System") infringes the 124 Patent. In particular, IV asserts that Travelers "makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import" the 124 Accused System in a manner that infringes Claim 1 of the 124 Patent. *See* Ex. 18.

236.    Contrary to IV's assertions, Travelers has not infringed and does not infringe, under any theory of infringement (including directly (whether individually or jointly), indirectly (whether contributorily or by inducement), and/or under the doctrine of equivalents), any claim of the 124 Patent, including through any making, use, offering to sell, selling, importing, and/or encouraging the making, using, selling, offering to sell, and/or importation of the 124 Accused

System or Kubernetes, at least because the 124 Accused System and Kubernetes do not employ, incorporate, use, or otherwise include all of the limitations of the 124 Patent's claims.

237.    Although there are additional reasons why Travelers, the 124 Accused System, and Kubernetes do not infringe the 124 Patent, non-limiting examples are discussed below.

238.    IV has only identified independent Claim 1 of the 124 Patent as asserted. Claim 1 recites:

1. A method comprising:

(a) receiving an indication of an occurrence of at least one *transition event* performed for at least one of a plurality of *computer-related hardware devices*, wherein the plurality of *computer-related hardware devices* include respective processors;

(b) recording information from the *transition event* into a centralized computerized database;

(c) monitoring for at least one change to the plurality of *computer-related hardware devices* and recording information associated with the change into the centralized computerized database; and

(d) managing at least one additional *transition event* for at least one of the plurality of *computer related hardware devices* using information available in the centralized computerized database

239.    Claim 1 requires a method focused on *physical* "computer-related *hardware* devices" (e.g., desktops, laptops, printers with processors) and their "transition events" (e.g., physical installation, relocation, disposition, maintenance). For example, Claim 1's step (a) limitation expressly requires "receiving an indication of an occurrence of at least *one transition event* performed for at least one of a plurality of *computer-related hardware devices* ...," expressly limiting the claimed step to being performed for *physical* computer-related hardware devices.

240.    This limitation requiring physical computer-related hardware devices is repeated and reinforced in multiple subsequent steps of Claim 1, including: Claim 1's step (c) of "monitoring for at least one change to the plurality of *computer-related hardware devices*" and Claim 1's step (d) of "managing at least one additional transition event for at least one of the

90

plurality of ***computer related <u>hardware devices</u>***." The plain language of Claim 1 thus makes clear that the claimed invention is limited to methods involving physical hardware assets and their physical transition events, not software programs, virtual resources, or software updates.

241.    During prosecution of the 124 Patent, the patentee, in response to an office action rejecting the claims over prior art, limited the alleged invention to a physical hardware device, expressly disclaiming software or any virtualized process or non-physical device. *See* Patentee's Office Action Response dated 2/18/2006 at 15 (attached as Ex. 33 hereto) ("Applicant respectfully submits that ***a software program is not a computer-related hardware device*** that includes a processor, as claimed.") shown below:

> In making out the rejection of this claim, the Office argues that claim 1 is anticipated by Nakamura. Applicant has amended claim 1 to recite a plurality of computer-related hardware ***devices***, wherein each of the plurality of computer-related hardware devices ***includes a processor***. Applicant respectfully submits that Nakamura does not teach or in any way suggest performing a transition event for at least one of a plurality of computer-related hardware devices that each includes a processor, as recited in claim 1. Rather, Nakamura discusses the production of "products", such as a software "program". (*Nakamura*, column 1, line 38). Applicant respectfully submits that a software program is not a computer-related hardware device that includes a processor, as claimed.

242.    Patentee reiterated this ***physical*** hardware limitation in a subsequent appeal, where it argued again that the patent's claimed "transition event" (e.g., "an asset installation, asset relocation, asset disposition or asset maintenance activity," *see* 124 Patent 2:51-52) does ***not*** and could ***not*** include "an update to a program or software in a computer," or a "change" to a "data element." *See* Patentee/Appellant Reply Brief at 3-4, dated December 9, 2010 (attached as <u>Ex. 31</u> hereto) shown below:

> This statement by the Office [about the prior art] clarifies that the Office considers that an 'update to a program or software in a computer' or a 'change' to a 'data element' anticipates a 'transition event,' as claimed. It is

91

respectfully submitted, however, that an 'update to a program or software in a computer' or a 'change' to a 'data element' cannot be considered a 'transition event,' as claimed and described in Appellant's specification. ***Appellant notes that 'computer-related <u>hardware devices</u>,' as described in the specification, may include without limitation 'desktop computers, laptop computers, handheld computers, printers, scanners, networking devices and storage devices'*** (Appellant's specification, page 9, lines 2 and 3).

A 'transition event,' as described in the specification, may include without limitation 'an asset installation, asset relocation, asset disposition or asset maintenance activity' (Appellant's specification, page 5, line 23 to page 6, line 1). ***Therefore, 'receiving an update to a program' or 'receiving an indication of a change to a data element' simply does not disclose, teach or in any way suggest or suggest the receipt of an occurrence of at least one <u>transition event</u> performed for at least one of a plurality of <u>computer-related hardware devices</u>, as claimed.*** **(underlined emphasis original.)**

The Board of Patent Appeals and Interferences accepted patentee's argument, finding that the prior art at issue did not disclose "receiving an indication of a transition event (i.e., an occurrence of a change) performed for a computer-related hardware device." *See* Board Decision at 4, dated February 24, 2012 (attached as <u>Ex. 32</u> hereto).

243.    The 124 Accused System and Kubernetes do not infringe the 124 Patent because Kubernetes, among other things, does not perform Claim 1's step (a) of "receiving an indication of an occurrence of at least one transition event performed for at least one of a plurality of computer-related ***hardware devices***." For example, the Kubernetes's documentation explains that "Kubernetes operates at the container level rather than at the hardware level ...." *See* https://kubernetes.io/docs/concepts/overview/ ("Kubernetes is a portable, extensible, open source platform for managing containerized workloads and services.") As illustrated below and explained in the documentation, Kubernetes is "decoupled from the underlying infrastructure" hardware and "raises the level of abstraction from running an OS on virtual hardware to running an application on an OS using logical resources." *Id*.



*Id.* In Kubernetes, "a set of worker machines, called nodes, [] run containerized applications. Every cluster needs at least one worker node in order to run ...." *See* https://kubernetes.io/docs/concepts/architecture "A node may be a virtual or physical machine," but "Kubernetes creates a Node object internally (the representation)" and Kubernetes cannot differentiate between physical hardware devices (i.e., "In cases when objects represent a physical entity, like a Node representing a physical host, when the host is re-created under the same name without deleting and re-creating the Node, Kubernetes treats the new host as the old one ..."). *See* https://kubernetes.io/docs/concepts/architecture/nodes; https://kubernetes.io/docs/concepts/overview/working-with-objects/names.          Therefore, Kubernetes cannot and does not satisfy Claim 1's requirement of "at least one transition event performed for at least one of a plurality of computer-related ***hardware devices***."

244.    Kubernetes also does not include Claim 1's recited "transition event" (i.e., "an occurrence of a change") performed for "at least one of a plurality of computer-related hardware devices." For example, documentation provides that "Kubernetes abstracts common resources [(e.g., 'CPU, memory, GPUs, etc')] for allocation to workloads and utilizes operating system

primitives (for example, Linux cgroups) to manage consumption by workloads" and sees all "devices" as "infrastructure resources." *See* https://kubernetes.io/docs/reference/glossary/?all=true#term-device; https://kubernetes.io/docs/reference/glossary/?all=true#term-infrastructure-resource.

> **Device**
> One or more infrastructure resources that are directly or indirectly attached to your nodes.[-]
> Devices might be commercial products like GPUs, or custom hardware like ASIC boards. Attached devices usually require device drivers that let Kubernetes Pods access the devices.

> **Resource (infrastructure)**
> Capabilities provided to one or more nodes (CPU, memory, GPUs, etc), and made available for consumption by Pods running on those nodes.Kubernetes also uses the term *resource* to describe an API resource.[-]
> Computers provide fundamental hardware facilities: processing power, storage memory, network, etc. These resources have finite capacity, measured in a unit applicable to that resource (number of CPUs, bytes of memory, etc). Kubernetes abstracts common resources for allocation to workloads and utilizes operating system primitives (for example, Linux cgroups) to manage consumption by workloads).
> You can also use dynamic resource allocation to manage complex resource allocations automatically.

Kubernetes cannot differentiate between physical hardware devices (i.e., "In cases when objects represent a physical entity, like a Node representing a physical host, when the host is re-created under the same name without deleting and re-creating the Node, Kubernetes treats the new host as the old one ..."). *See* https://kubernetes.io/docs/concepts/overview/working-with-objects/names. This is so because "Kubernetes abstracts away the hardware infrastructure and exposes your whole datacenter as a single enormous computational resource ... [and this] allows you to deploy and run your software components without having to know about the actual servers underneath." *See* https://gist.github.com/madhub/af18086cc01fdba1ea03893063e3de87. As another example, documentation explains that when Kubernetes detects that a pod running on a node has failed, Kubernetes is detecting a software event (the termination of a containerized process), not a change to any physical hardware device. *See* https://kubernetes.io/docs/concepts/workloads/pods/pod-

lifecycle/. As such, Kubernetes only involves precisely the type of "update to a program or software to a computer" or "change to a data element" that the patentee expressly disclaimed multiple times during prosecution of the 124 Patent. *See, e.g.*, Patentee's Office Action Response dated 2/18/2006 at 15 (Ex. 33) ("Applicant respectfully submits that ***a software program is not a computer-related hardware device*** that includes a processor, as claimed"); 12/09/2010 Patentee/Appellant Reply Brief at 4 (Ex. 31) (asserting "an 'update to a program or software in a computer' or a 'change' to a 'data element' ***cannot*** be considered a 'transition event,' as claimed and described in [patentee's] specification.")

245.    At least because of the absence of the "receiving an indication of an occurrence of at least one transition event performed for at least one of a plurality of computer-related hardware devices," "recording information from the transition event into a centralized computerized database, " or "managing at least one additional transition event for at least one of the plurality of computer related hardware devices" as discussed above, Travelers does not directly infringe the 124 Patent, either literally or under the doctrine of equivalents.

246.    Likewise, at least because there is no direct infringement, Travelers does not indirectly infringe the 124 Patent, including no induced or contributory infringement of the 124 Patent.

247.    Absent a declaration of non-infringement, IV will continue to wrongfully allege that Travelers infringes the 124 Patent, and thereby cause Travelers irreparable injury and damage.

248.    For at least these reasons, an actual, justiciable, substantial, immediate, and continuing controversy exists between Travelers and IV regarding whether Travelers infringes or has infringed the 124 Patent.

249.    Travelers therefore seeks a judicial declaration under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., finding that Travelers (including through its alleged use of the 124 Accused System and Kubernetes) does not infringe the 124 Patent.

**COUNT XIII**
**DECLARATION OF NON-INFRINGEMENT OF THE 589 PATENT**

250.    Travelers incorporates by reference paragraphs 1-50 as if fully set forth herein.

251.    The 589 Patent is titled "Systems and Methods for Using Lexically-Related Query Elements Within a Dynamic Object for Semantic Search Refinement and Navigation." The 589 Patent's Abstract states:

> A method and system for dynamically refining and navigating between alternative search query elements are disclosed. The method and system are applicable to searching an information system such as the Internet, an intranet, or any database, lexicon, or collection of documents, disk drive, images or video or audio content. A user enters their search query into a search query receiver. As the user enters their search query, they see, in real-time in a dynamically-generated object, such as a drop-down menu, iFrame, or browser window, possible matches to their search query string, and more specifically, the user receives within the dynamic object alternative semantically- and lexically-related search elements that relate to the search query string and from which the user can either make a selection to further refine their search query, or the user can proceed to view search results based on the selected query element. The relation of alternate lexical elements is based on a controlled or structured vocabulary (for example a thesaurus).

252.    IV has asserted that website search functionality on travelers.com (the "589 Accused System") infringes one or more claims of the 589 Patent. In particular, IV asserts that Travelers "makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import" the 589 Accused System in a manner that infringes the 589 Patent. *See, e.g.*, Ex. 18. In support, the only detail IV provides is the slide below from IV's 4/7/2026 notice letter:

96



253.    Contrary to IV's assertions, Travelers has not infringed and does not infringe, under any theory of infringement (including directly (whether individually or jointly), indirectly (whether contributorily or by inducement), and/or under the doctrine of equivalents), any claim of the 589 Patent, including through any making, use, offering to sell, selling, and/or encouraging the making, using, selling, offering to sell, and/or importation of the 589 Accused System, at least because the 589 Accused System does not employ, incorporate, or otherwise make use of all of the limitations of the 589 Patent's claims.

254.    Although there are additional reasons why Travelers and the 589 Accused System do not infringe any claim of the 589 Patent, several non-limiting examples are discussed below.

255.    IV has only identified independent Claim 22 of the 589 Patent as asserted. Claim 22 recites:

22. A computer-based method for identifying a query element suitable for use in search refinement and navigation of a network-connected information system having a predetermined lexical content, the method comprising the steps of:

97

a) in a client computing device that is operatively connected to an information system via a first network, visually providing a graphical search interface including a search query receiver and a search query element viewer;

b) receiving input of a query element on a character-by character basis from a user via the search query receiver;

c) forwarding of the received portion of the query element to a query controller;

d) receiving a plurality of alternative query elements from *a controlled vocabulary database* via the query controller, the alternative query elements each having *a predetermined lexical relationship* to the forwarded portion of the query element;

e) displaying the plurality of alternative query elements to a the user via the search query element viewer, wherein the step of displaying occurs dynamically as input is received via the search query receiver; and

f) upon selection of an alternative query element within the search query element viewer by a the user, performing one of the following steps:

(i) navigating the information system in accordance with the selected alternative query element;

(ii) replacing the received portion of the query element with the selected alternative query element and repeating steps (c) through (d).

256.    With respect to Claim 22's limitation "a controlled vocabulary database" with alternative query elements that each have "a predetermined lexical relationship" to the forwarded portion of the query element received from the user, the 589 specification states "the term 'lexically-related' includes any items such as words, concepts, objects, entities, etc. that are part of and reside in the controlled vocabulary database and that are 'connected' by virtue of some relation, be it linguistically (e.g., broader/narrower), functionally associated (e.g., 'door' is associated with 'house'), financially (e.g., price, discount, time limit), visually (e.g., photo examples of a product), alternatives or options, etc., with the lexicon of the information system of interest." 589 Patent 8:30-38. "The relation of alternate lexical elements can be based on a pre-defined, controlled or structured vocabulary stored within the controlled vocabulary database[]. One example might be a thesaurus-derived vocabulary, which includes synonyms of words/phrases in the information system to be searched." *Id.* 9:1-5.

98

257.     In a usage example, the 589 Patent explains that for "a commercial website, such as PCConnection.com, ... a user might enter 'giga' into the search query receiver and then interact in the search query element viewer with lexical alternatives such as 'hard drive, disk drive, gigabyte drive, Seagate 250GB,' which might all be terms/phrases that are contained in the controlled-vocabulary database associated with the PCConnection.com information system lexicon of part numbers or product names." *Id.* 5:5-15. In contrast the 589 Patent explains that "conventional search methods are natural-language based, meaning that if you search for (enter a query for) 'hard drive' and the information system's lexicon contains only the term 'disk drive,' then no search results will be returned. ... [The] illustrated embodiments [of the 589 Patent, however,] will return lexical alternatives listed in the search query element viewer ... [, e.g.,] as the user enters 'hard dr' on a type-ahead basis en route to entering 'hard drive,' they might see 'disk drive' listed as an alternative in the search query element viewer in addition to or instead of the term 'hard drive.'" *Id.* 4:49-59.

258.     The 589 Accused System and travelers.com do not infringe the 589 Patent at least because they lack "a controlled vocabulary database" with alternative query elements that each have "a predetermined lexical relationship" to the forwarded portion of the query element received from the user. IV's own alleged screenshot of travelers.com shows "inv" typed in a search box causing the suggestions "invoices," "invoice," "investigator contact," "investors," and "investor tax forms" to appear. None of these suggestions have a predetermined lexical relationship to the "inv" query in the search box (e.g., unlike "hard dr" typed en route to entering "hard drive" causing "***disk*** drive" and "***hard*** drive" to appear, typing "inv" does not cause suggestions connected with some relation, such as synonyms, broader terms, narrower terms, or functional associations, etc.,

99

to appear) or appear to be from a controlled vocabulary database (e.g., a database with thesaurus-derived vocabulary, synonyms of words/phrases, etc.).

259.    At least because of the absence of a "controlled vocabulary database" and "predetermined lexical relationships" as discussed above, Travelers does not directly infringe the 589 Patent, either literally or under the doctrine of equivalents.

260.    Likewise, at least because there is no direct infringement, Travelers does not indirectly infringe the 589 Patent, including no induced or contributory infringement of the 589 Patent.

261.    Absent a declaration of non-infringement, IV will continue to wrongfully allege that Travelers infringes the 589 Patent, and thereby cause Travelers irreparable injury and damage.

262.    For at least these reasons, an actual, justiciable, substantial, immediate, and continuing controversy exists between Travelers and IV regarding whether Travelers infringes or has infringed the 589 Patent.

263.    Travelers therefore seeks a judicial declaration under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, finding that Travelers (including through its alleged use of the 589 Accused System and travelers.com) does not infringe the 589 Patent.

**COUNT XIV**
**<u>DECLARATION OF NON-INFRINGEMENT OF THE 349 PATENT</u>**

264.    Travelers incorporates by reference paragraphs 1-50 as if fully set forth herein.

265.    The 349 Patent is titled "Methods for Effective Processing of Time Series." The 349 Patent's Abstract states:

> A method of effectively representing and processing data sets with time series is disclosed. The method may comprise representing time series as a virtual part of data in a data store layer of a user system, thereby allowing processing of time-series related queries in said data store layer of said user system.

266.    IV has asserted that third-party software called Elasticsearch that IV alleges Travelers is using (the "349 Accused System") infringes the 349 Patent. In particular, IV asserts that Travelers "makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import" the 349 Accused System in a manner that infringes Claim 1 of the 349 Patent. *See, e.g.*, Ex. 18. IV has not provided further details on the 349 Accused System's or Elasticsearch's alleged infringement of the 349 Patent.

267.    Contrary to IV's assertions, Travelers has not infringed and does not infringe, under any theory of infringement (including directly (whether individually or jointly), indirectly (whether contributorily or by inducement), and/or under the doctrine of equivalents), any claim of the 349 Patent, including through any making, use, offering to sell, selling, and/or importing of the 349 Accused System or Elasticsearch, at least because the 349 Accused System and Elasticsearch do not employ, incorporate, use, or otherwise include all of the limitations of the 349 Patent's claims.

268.    Although there are additional reasons why Travelers, the 349 Accused System, and Elasticsearch do not infringe the 349 Patent, non-limiting examples are discussed below.

269.    IV has only identified independent Claim 1 of the 349 Patent as asserted. Claim 1 recites:

1. A method comprising:

maintaining a data store that is configured to provide an answer to one or more queries comprising a requested dimension and a requested measure;

representing at least a portion of time series data as ***a virtual part of data in the data store without actually being stored in the data store***, the time series data comprising a sequence of data elements given in some order of a time attribute, thereby enabling processing of time-series related queries in a data store layer of said user system;

organizing data having a plurality of dimensions, including a time dimension and a non-time dimension, in the data store according to at least a first of said one or more dimensions, said first dimension being other than the time

dimension, wherein the data is not stored in timestamp order, to form a first plurality of data streams for respective objects in the data, followed by organizing data in respective data streams for respective objects according to the time dimension, to thereby split the data into disjoint chunks, with respect to the time dimension, which can be processed separately in response to a time series query;

receiving, at a computer system comprising one or more computing devices, at least a first time series query from a user directed to the data store;

and at least partly in response to receiving the first time series query and without translating the first time series query into middle queries, scanning the data store layer, and manipulating extracted data entries to generate, by the computer system, a response to the first time series query at the data store layer based at least in part on data from the time series data that is a virtual part of data in the data store that is not actually stored in the data store.

270. With respect to Claim 1's limitation of representing at least a portion of time series data as "a virtual part of data in the data store without actually being stored in the data store," the 349 specification states that "Basic Object of Time Series" ("BOTS") "is a virtual measure of a data store entry (e.g., a measure not existing in data entries of a data store layer)" and that "[t]ime series may be calculated by external or internal procedure in data store layer." 349 Patent 7:28-31. As an example, the 349 specification explains that "BOTS for [a year to date (]YTD[)] time series measure may be defined in a data store layer as follows" with a computational procedure instead of a stored data value:

```
:
<measure_YTD>
<Logic of measure calculation: summarize all data entries' measures
starting from the year of a given date, and up to the given date>
</measure_YTD>
```

*Id.* 7:51-60.

271. The 349 Accused System and Elasticsearch do not infringe the 349 Patent at least because they lack a representation of at least a portion of time series data as "a virtual part of data in the data store without actually being stored in the data store." The 349 Accused System and Elasticsearch do not define "a virtual part of data in the data store without actually being stored in

the data store" (e.g., a measure with computational logic whose values do not exist in the data entries at the data store layer). Elastic documentation states that "Elasticsearch serializes and stores data in the form of JSON documents. A document is a set of fields, which are key-value pairs that contain your data." *See, e.g.*, https://www.elastic.co/docs/manage-data/data-store/index-basics. "Elasticsearch does not support stored procedures, so you will need to implement any such logic externally." *See, e.g.*, https://discuss.elastic.co/t/stored-procedure-in-elastic-search/165882.

272.    At least because of the absence of representing at least a portion of time series data as "a virtual part of data in the data store without actually being stored in the data store" as discussed above, Travelers does not directly infringe the 349 Patent, either literally or under the doctrine of equivalents.

273.    Likewise, at least because there is no direct infringement, Travelers does not indirectly infringe the 349 Patent, including no induced or contributory infringement of the 349 Patent.

274.    Absent a declaration of non-infringement, IV will continue to wrongfully allege that Travelers infringes the 349 Patent, and thereby cause Travelers irreparable injury and damage.

275.    For at least these reasons, an actual, justiciable, substantial, immediate, and continuing controversy exists between Travelers and IV regarding whether Travelers infringes or has infringed the 349 Patent.

276.    Travelers therefore seeks a judicial declaration under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, finding that Travelers (including through its alleged use of the 349 Accused System and Elasticsearch) does not infringe the 349 Patent.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Travelers respectfully requests the following relief:

1.      A declaratory judgement in favor of Travelers and against IV on Travelers's claims;

2.      A declaration that Travelers does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the 844 Patent;

3.      A declaration that Travelers does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the 785 Patent;

4.      A declaration that Travelers does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the 722 Patent;

5.      A declaration that Travelers does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the 582 Patent;

6.      A declaration that Travelers does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the 080 Patent;

7.      A declaration that Travelers does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the 081 Patent;

8.      A declaration that Travelers does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the 584 Patent;

9.      A declaration that Travelers does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the 762 Patent;

10.      A declaration that Travelers does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the 894 Patent;

11.      A declaration that Travelers does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the 287 Patent;

12.    A declaration that Travelers does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the 183 Patent;

13.    A declaration that Travelers does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the 124 Patent;

14.    A declaration that Travelers does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the 589 Patent;

15.    A declaration that Travelers does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the 349 Patent;

16.    An order enjoining IV and those in privity with IV from asserting the 844, 785, 722, 582, 080, 081, 584, 762, 894, 287, 183, 124, 589 and 349 Patents against Travelers and Travelers's affiliates, subsidiaries, representatives, agents, vendors, and customers;

17.    A finding this is an exceptional case under 35 U.S.C. § 285;

18.    An order awarding attorney fees, expenses of litigation, and costs to Travelers; and

19.    Such other and further relief as the Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Travelers demands a jury trial on all issues and claims so triable.

Dated: April 8, 2026

OF COUNSEL:
Joshua D. Curry
Jonathan D. Goins
Lewis Brisbois Bisgaard Smith LLP
600 Peachtree St. NE, Suite 4700
Atlanta, GA 30308
josh.curry@lewisbrisbois.com
jonathan.goins@lewisbrisbois.com
Ph 404.348.8585

François O. Ecclesiaste
Lewis Brisbois Bisgaard Smith LLP
90 S 7th Street, Suite 2800
Minneapolis, MN 55402
francois.ecclesiaste@lewisbrisbois.com
Ph 612.428.5048

Respectfully submitted,

**LEWIS BRISBOIS BISGAARD SMITH LLP**

 */s/Keith A. Walter*
Keith A. Walter (No. 4157)
500 Delaware Ave., Suite 700
Wilmington, DE 19801
Ph 302.985.6000
keith.walter@lewisbrisbois.com

*Attorneys for Plaintiff The Travelers Indemnity Company*

106